Mark D. Rosenbaum (SBN 59940)
mrosenbaum@publiccounsel.org
PUBLIC COUNSEL
610 South Ardmore Avenue
Los Angeles, CA 90005
Telephone: (213) 385-2977

Lisa M. Gilford (SBN 171641)
lgilford@sidley.com
David R. Carpenter (SBN 230299)
drcarpenter@sidley.com
Stacy Horth-Neubert (SBN 214565)
shorthneubert@sidley.com
SIDLEY AUSTIN LLP
555 West Fifth Street
Los Angeles, CA 90013
Telephone: (213) 896 6044
Facsimile: (213) 896 6600

*Additional Counsel Listed on Next Page*

Attorneys for Plaintiffs
Z.W., C.Y, X.Y., A.G., M.X., Z.L., W.R.,
and DOES 1 through 50

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## SOUTHERN DIVISION AT SANTA ANA

| | |
|---|---|
| Z.W., C.Y, X.Y., A.G., M.X., Z.L., W.R., and DOES 1 through 50,<br><br>Plaintiffs,<br><br>vs.<br><br>U.S. DEPARTMENT OF HOMELAND SECURITY; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; CHAD R. WOLF, Acting Secretary, U.S. Department of Homeland Security; MATTHEW ALBENCE, Acting Director, U.S. Immigration and Customs Enforcement,<br><br>Defendants. | Case No.   8:20-cv-01229<br><br>Assigned to:<br><br>**COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF** |

Evan Caminker (*pro hac vice forthcoming*)
caminker@umich.edu
Dean Emeritus and Branch Rickey Collegiate Professor of Law
University of Michigan Law School*
701 South State Street, 3250 South Hall
Ann Arbor, MI  48109-1215
Telephone: (734) 763-5221

Mark E. Haddad (SBN 205945)
markhadd@usc.edu
USC Gould School of Law
University of Southern California*
699 Exposition Blvd.
Los Angeles, CA  90089
Telephone:  (213) 675-5957

*University affiliation provided
for identification purposes only*

2

**INTRODUCTION**

1.      Less than one month after the Supreme Court held that the Executive Branch must "turn square corners" before taking an action that profoundly disrupts the lives of hundreds of thousands of individuals, the Executive Branch has once again acted recklessly and inexplicably to disrupt the lives of hundreds of thousands more. On July 6, Immigration and Customs Enforcement ("ICE") issued a press release announcing that students at colleges and universities that are offering exclusively online classes in the fall 2020 academic term because of the coronavirus pandemic would be required to leave the United States. This politically motivated directive upended the lives of foreign students who are lawfully present in this country and who contribute immeasurably to the quality of education at the institutions they attend. These students chose to come to the United States to pursue degrees in law, medicine, engineering, and every other academic field. They wish to prepare themselves to lead productive lives that serve and build community wherever they ultimately settle. Access to our outstanding institutions of higher education is one of the greatest gifts that the United States gives the world, and that gift is repaid many times over by the contributions that foreign students make to the United States and to the world as a whole by virtue of the learning they receive. Those contributions reflect their intelligence, compassion, and hard work.

2.      In the midst of the most dangerous pandemic of the last hundred years, universities and graduate schools have reshaped their educational models to ensure the quality, continuity and safety of their educational programs. Utilizing their educational expertise and recognizing their paramount responsibility to the safety of the university community and the community at large, leadership at these schools have reluctantly accepted the judgments of our nation's leading public health experts and CDC guidelines and have instituted remote learning and teaching strategies and regimens. It should go without saying that these decisions have not been easy. But it should also be

readily recognized that a university's decision to go all or principally remote is one of life and death. Universities are doing their part to flatten the curve and repel the deadly coronavirus that thrives on crowded settings inside buildings, precisely the circumstances of normal classroom teaching and university life. And until July 6, universities were doing so in reasonable reliance on guidance that ICE itself had provided in March 2020, and that promised a flexible approach of allowing students to maintain their visas while schools attempted, in good faith and with timely notice to ICE, to provide the best educational opportunities possible while fulfilling indispensable obligations to preserve the health of their students and their communities.

3.    On July 6, ICE abruptly changed course 180 degrees, without explanation or even acknowledgement.  Its decision effectively punishes foreign students because their universities have prioritized the health and safety of their academic and local communities and of the nation by choosing to hold remote classes in the fall term.

4.    The July 6 Guidelines offer no explanation whatsoever for the complete reversal in policy. But the facts are that the President of the United States, beset by falling poll numbers in a fast closing election year, has tweeted repeatedly that CDC guidelines must be altered and schools must open in the fall no matter the incongruity with fundamental public health principles and the sound, on-the-ground knowledge and expertise of university officials as to the safest course for their students and community. Indeed, on the day that the ICE message was issued, he tweeted that "SCHOOLS MUST OPEN IN THE FALL!!!"[1] The next day, Acting Deputy Secretary of Homeland Security Ken Cuccinelli, responding to a question about the July 6 Guidelines, explained the guidelines were "setting the rules . . . that will, again, encourage schools to reopen."[2]

---

[1] Donald J. Trump (@realDonaldTrump), Twitter (July 6, 2020, 2:40 PM EDT), https://twitter.com/realDonaldTrump/status/1280209946085339136?s=20.
[2] Johe Bowden, *Cuccinelli Says Rule Forcing International Students to Return Home Will 'Encourage Schools to Reopen'*, The Hill (July 7, 2020),

5.      ICE's announcement concerning international students attending institutions that did not offer in-person instruction, or who were not able to take the in-person classes that were offered, is part and parcel of the President's approach. These guidelines, which adopt a one-size-fits-all approach to higher education, are blunt. They do not reflect the intensely local nature of university decisions, nor do they make exceptions for students at heightened risk from the novel coronavirus. Instead, the guidelines are designed to force institutions of higher education to reopen for the fall term, no matter the cost.

6.      This life-threatening action makes foreign students pawns in a political drama. Tragically, but unsurprisingly, ICE's press release was not accompanied by any of the safeguards the APA requires to insure "reasoned decision making" and accountability: notice and comment, rational explanation for the attack on prudent and grounded university decision making, and careful examination of the reliance interests of the students who are suddenly confronted with life and death choices. The ICE announcement makes no sense except as an irrational and cruel action designed to advance objectives having nothing to do with public health, learning, and reasonable immigration policy. The policy is indefensible, and the absence of any record or explanation for its sudden imposition is not just proof of illegality – it is evidence that no rational explanation exists.

7.      The narratives of plaintiffs, all serious students pursuing meaningful careers, illustrate the irrationality of the ICE announcement and describe the terrible consequences of allowing it to take effect. Students required to come to campus and expose themselves to the coronavirus cannot do so without risking both their health and the health of others. Some students have preexisting conditions that heighten the danger. But if they act in keeping with essential public health practices, maintaining social distancing measures in enclosed spaces with strangers, they will be left asunder,

https://thehill.com/homenews/administration/506248-cuccinelli-says-rule-forcing-international-students-to-return-home.

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

many with literally no place to go because of international travel restrictions to their home nations. They will jeopardize their immigration status and future education and career prospects. Their education will come to a screeching halt. They will be placed in financial calamity.

8.     This lawsuit seeks the invalidation of the ICE guidelines upon the bedrock principles underlying the APA: reasoned decision making, public notice and hearing, and sensitive consideration of reasonable reliance interests. The government has nothing to lose by giving orderly respect to these mandates; the foreign students, their universities and communities, and those who stand by the rule of law, have everything.

## **PARTIES**

9.     Plaintiff Z.W. is a 25 year-old Chinese national entering his second year of study at University of California Irvine School of Law in Irvine, California. After learning about UCI Law's remote learning transition, he entered into a 13-month lease for an apartment in Irvine with monthly rent of $1,730 and security deposit. He entered into the lease with the expectation that he would be able to continue his education through distanced, remote learning. Z.W. was preparing to apply for a CPT visa so he could intern over the next, 2L summer to further his legal education.  His eligibility for the CPT visa, however, will be foreclosed if his F-1 visa is terminated. Similar to all plaintiffs who are Chinese nationals, he is deeply concerned with the financial costs associated with returning to China. He has paid a deposit for his apartment out of pocket, and does not know how he will manage to pay for a return flight to China, or the associated costs of China's mandatory 14-day quarantine. His education will also be essentially prematurely terminated or paused, because of China's prohibition on Google and VPN use, in addition to the 12 hour time difference.

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

10.     Plaintiff C.Y. is a 27 year-old Chinese national entering her second year of law school at UCI Law. She currently lives in Irvine, California where she moved in 2019 to enroll in her first year of law school. When UCI Law switched to online classes in March 2020 and SEVP issued the March 13 Guidance, C.Y. believed she would be able to continue her studies in the United States regardless of how UCI Law choose to offer classes in the fall. So she leased on-campus housing through spring 2021, and pre-paid rent at a total cost of $10,380. If she were to have to return to China, she would not be able to recover that rent. Additionally, it would be prohibitively expensive for C. Y. to return to China, as the price of airline ticket from Los Angeles to China has increased several fold since the start of the pandemic and could easily exceed $10,000. Her family cannot afford to pay the price of her plan ticket back to China, nor can she. It will also be cost-prohibitive to pay for the hotel room in which she would be required to self-quarantine for 14 days after returning to China. If she were forced to return to China in the coming months, C. Y. also fears she will be exposed to the novel coronavirus on the flight to China and become infected, as she heard happened to more than a dozen people on a recent international flight to China. Once in China, C. Y. would not be able to continue to take law school classes due to, among other things, the unavailability in China of tools that UCI Law uses to facilitate online learning, including Google products (e.g., Google Drive) and secure VPNs. Additionally, the 15 to 16 hour time change would make it practically impossible for her to engage in clinical programs in which she has enrolled and to engage in important conferences with fellow students and professors. C. Y. does not feel safe attending in-person classes due to the health risks and therefore planned to take all of her courses online in the fall. The prospect of making C. Y. choose between a potentially unsafe in-person class and a prohibitively costly emergency journey home is causing her severe distress, which she will worries will negatively impact her grades.

11.     Plaintiff X. Y. is a 25-year-old Chinese national who has attended UCI Law on an F-1 visa since 2018 and this fall, will be entering her third and final year at UCI Law. In reliance upon the SVEP's March guidance and UCI's June statements that the fall semester would be held remotely, X.Y. and her partner, a UCLA student, entered into a 12-month lease for an apartment in Los Angeles. She also cancelled an August trip to visit family at home in China because she anticipated complications, including travel difficulties and the possibility of not being able to return to the United States to finish her program, resulting from the pandemic. She thought it was safer to stay in place. X. Y. is deeply concerned about the prospect of travel at a time of increased risk of community transmission both nationally in the United States and locally in Los Angeles. Her healthcare plan is effective through UCI enrollment, so she doesn't know if she would have healthcare coverage in China. X. Y. is concerned she will have to drop out of school if she is forced to return to China, because attending live-streamed classes would mean that X. Y. would need to attend school in the middle of the night, and she would have no way to obtain required casebooks. X. Y. had planned to work as a research assistant for a professor during the upcoming semester, but it will be impossible to do so if she is in China. Her ability to apply for a permanent work visa, after being forced to return to China, will be considerably more burdensome than if she remained in the United States, as she had planned.

12.     Plaintiff A. G. is a 25-year-old German national who has been attending the University of Southern California Law School (USC Law) in Los Angeles, California, on an F-1 visa, will be entering her third and final year. She lives in Los Angeles, where she is responsible for a lease and is employed through the summer by a law firm. Her responsibilities in the United States include being the sole familial caretaker for her almost 90 year-old great aunt who lives in Los Angeles. A. G. drives her to doctor's appointments and goes grocery shopping for her. A. G. is nervous about the prospect of having to fly if she were forced to return to Germany, where she

would need to live with her immediate family. She fears that the return flight will expose her to the novel coronavirus and then put her family members at risk because of their high risk for COVID-19 complications. Her father has four stents in his heart and her mother has high blood pressure. She herself has no known pre-existing conditions, but she would be unable to take advantage of her US health insurance in Germany. If forced to return to Germany, A. G. would have difficulties continuing her studies, as she would need to take her classes in the middle of the night, due to the nine-hour time difference, and textbooks may be difficult to obtain. If USC Law were to transition to hybrid instruction, A. G. would attend in-person classes in order to stay in the country, but would not feel safe doing so.

13.   Plaintiff M. X. is a 26-year-old Chinese national entering her second year of study at UCI Law. Because of the exemption granted by ICE, and UCI's June announcement of remote instruction in the fall, M. X. decided to plan for the upcoming year by renewing her on-campus lease for a year, and has already begun paying rent under the lease. M. X. planned to continue her studies in the United States, and planned to intern next summer. In order to do so, she would need the CPT visa. Her eligibility for the CPT visa, however, will be foreclosed if her F-1 visa is terminated. She faces the additional financial burden of extremely expensive return flights to China and expenses associated with China's mandatory 14-day quarantine. M. X. does not have the financial means to pay these required costs out of pocket on such short notice. Similarly, it would be effectively impossible for her to continue her studies while in China, due to the time difference and restrictions against Google and VPN use, meaning she would not be able to attend or participate in school even if the time zone were not an issue. If UCI were to transition to hybrid learning solely for international students, M. X. is concerned about the risk of infection in a classroom requiring physical attendance.

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

14. Plaintiff Z. L. is a 25 year-old Chinese national who lives in Los Angeles and is enrolled as a PhD student at University of California, Los Angeles ("UCLA"), focusing on cinema and media studies. She enrolled at UCLA in 2017 and holds an F-1 visa. After UCLA switched to online operations in late March, Z. L. remained in the United States because she did not want to risk her or her parents' health and safety by traveling to China during a pandemic. She worries about returning to China because traveling will place her at risk of contracting COVID-19, as she will be exposed to people who may be infected with the virus at airports and inside the plane. If she were forced to return to China, Z. L. would not be able to continue her studies for several reasons. For instance, due to the 15-hour time difference between Los Angeles and China, Z. L. will have to attend her online classes at unconventional times. For example, Z. L. will have to call into a 1 p.m. Monday class at 4 a.m. on Tuesday, Beijing time. Watching recorded classes is not an option for her because graduate-level courses are designed to be centered around conversations and dialogue with other students than lecture. Relying on class recordings would deprive her of important opportunities to learn from and with her peers. Z. L. is concerned that taking in-person classes will jeopardize her health, and had been planning to take all of her fall 2020 courses online. In China, Z. L. will not be able to access the print and digital media resources she needs to complete her dissertation, and strict quarantine requirements will likely impair her ability to study for her PhD qualifying exam. Failure of the exam could jeopardize the funding she needs to complete the years-long program she has undertaken. Z. L. housing situation is unsettled and if she returns to China she will have to pay costs of storage for her belongings and car. Not knowing whether she must leave the country or risk serious illness—or even death—is keeping Z. L. tense and causing her great distress.

15. Plaintiff W. R. is a 26-year-old Chinese national entering his second year of school at UCI Law School who currently lives near Irvine, California in San Juan

Capistrano. Several months ago in March, UCI Law announced its decision to conduct remote instruction. Around that same time, W.R. received an exemption from ICE to remain in the United States with his wife, who is a permanent resident alien living in San Juan Capistrano and owns a business in the United States. If he is forced to return to China, he will be separated from his wife. He will also suffer financial losses based on decisions made in reliance on his ability to stay in the United States for his studies. If he is required to return to China, W. R.'s financial burden will also be compounded by the high cost of travel to China in the era of COVID-19, with average one-way economy flights priced at close to $10,000 (more than eight times the cost of a single flight to China before the pandemic). Additionally, passengers arriving from outside China are financially responsible for room and board associated with China's mandatory 14-day quarantine, which would also be a financial hardship for W. R. If he is required to return to China, W. R.'s legal education will not be able to continue for all practical purposes. He will not be able to participate in classes, important group, or conduct necessary research due to the 15 to 16 hour time zone difference and China's strict ban against Google and VPN usage, both of which are required to access the research databases and at UCI Law.  W. R. will also be unable to benefit from the student legal clinic in which he is enrolled for the upcoming fall semester if he has to return to China.  If he is required to attend in-person instruction, W. R. is concerned for his health and safety due to threat of exposure to the novel coronavirus.

16.     Defendant United States Department of Homeland Security is a federal agency of the United States.

17.     Defendant United States Immigration and Customs Enforcement is a division of the United States Department of Homeland Security.

18.     Defendant Chad F. Wolf is the Acting Secretary of the United States Department of Homeland Security. He is sued in his official capacity.

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

19.     Defendant Matthew Albence is the Acting Director of the United States Immigration and Customs Enforcement. He is sued in his official capacity.

## JURISDICTION AND VENUE

20.     This Court has jurisdiction over this case pursuant to 28 U.S.C. § 1331 and 5 U.S.C. § 702. Plaintiffs are persons aggrieved by a final agency action promulgated by Defendants. *See* 5 U.S.C. § 702. Plaintiffs bring this suit for declaratory and injunctive relief to set aside Defendants' action as contrary to law and arbitrary and capricious, *see id.* §§ 705–706, and as a violation of due process under the Fifth Amendment to the United States Constitution—thus presenting a federal question, *see* 28 U.S.C. § 1331.

21.     Venue is proper in this Court because Plaintiffs reside in this District—specifically, a majority attend UCI and reside in or near Irvine—and no real property is involved. 28 U.S.C. § 1391(e)(1)(C).

22.     Plaintiffs have standing to bring this case. Defendants' actions will cause an imminent, concrete, and irreparable risk of harm to Plaintiffs, their families, their educations, their short-term and long-term health, and their future education and employment prospects unless halted by this Court.

23.     This Court is authorized to grant the requested injunctive relief pursuant to Federal Rule of Civil Procedure 65 and 5 U.S.C. § 705.

## FACTS

### Higher Education and the COVID-19 Pandemic

24.     The world is in the midst of the global COVID-19 pandemic.

25.     Because humans lack built-up immunity to, or a vaccine against or effective treatment for, the novel SARS-CoV-2 virus that causes COVID-19, the only way to mitigate the effects of the virus today is to stop its spread.

26.     State and local governments have responded to the pandemic with unprecedented containment measures such as stay-at-home orders that instructed state

residents to avoid leaving their residences. At one point, 42 states instituted such orders.[3]

27.     On March 4, 2020, California Governor Gavin Newsom declared a state of emergency in light of the COVID-19 pandemic.[4]

28.     On March 9, the University of California at Berkeley suspended in-person instruction.[5]

29.     On March 10, the University of California campuses at Davis, Irvine, Los Angeles, Riverside, and Santa Barbara followed suit, as did the University of Southern California.[6]

30.     On March 19, Governor Newsom announced a statewide stay-at-home order.[7] Among other things, this order forbade universities from continuing to operate in-person classes, including the schools plaintiffs attend.

31.     While the order has been amended to loosen restrictions, the order could be tightened again at any time.

32.     COVID-19 infections are surging across the country and in California. Nationwide, three million COVID-19 cases have been diagnosed, and more than 132,000 people have died.[8] Meanwhile, cases are on the upswing: 50,000 new cases were reported nationwide on six of the first eight days in July. The total reported cases on ten days since June 26 has exceeded the prior single-day record set on April 6. And on July 8, the number of reported daily cases broke 60,000 for the first time.[9]

---

[3] Jasmine C. Lee *et al.*, *See How All 50 States Are Reopening (and Closing Again)*, N.Y. Times (July 8, 2020), https://www.nytimes.com/interactive/2020/us/states-reopen-map-coronavirus.html.
[4] https://www.gov.ca.gov/wp-content/uploads/2020/03/3.4.20-Coronavirus-SOE-Proclamation.pdf
[5] https://news.berkeley.edu/2020/03/09/as-coronavirus-spreads-uc-berkeley-suspends-in-person-instruction/
[6] https://www.latimes.com/california/story/2020-03-10/ucla-to-cancel-most-in-person-classes-until-early-april-to-protect-against-coronvirus
[7] Executive Order N-33-20, Executive Dep't State of California (March 19, 2020).
[8] *Cases in the U.S.*, Ctrs. for Disease Control & Prevention, https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html (last visited July 10, 2020).
[9] *See* https://www.nytimes.com/2020/07/09/world/coronavirus-updates.html (last visited July 9, 2020);

33.     In California, over 296,000 people have tested positive for the novel coronavirus.[10] On July 8, an average of 7,000 new cases were reported in the state every day. Since June 29, California has reported its five highest daily new case totals since the pandemic began. These new cases are not the result of more testing - California's test positivity rate has also increased over the last several weeks.[11] Daily hospital admissions for COVID-19 patients have risen every day since June 18. And the trendline is positive, suggesting COVID-19 in California is likely to get even worse. On July 8, the state reported is highest number of COVID-19 deaths to date.

34.     Both in California and nationwide, the COVID-19 pandemic is worse than at any point during the spring academic semester.

35.     In recognition of the continuing threat COVID-19 posed to its students, staff, and faculty, on June 23, the University of California, Irvine School of Law ("UCI Law") announced that all second- and third-year law students would only be able to take on-line courses.[12]

36.     Likewise, on June 26, the University California at Berkeley Law School ("Berkeley Law") announced that it would conduct the fall 2020 term entirely online.[13] Berkeley Law determined that restrictions on the number of students in a classroom and the requirement that classrooms be disinfected between classes would make offering safe, in-person instruction infeasible.

37.     Schools in the University of California system are not alone in moving some or all students fully online in the fall semester. Harvard University[14] and the University of Southern California[15] will offer exclusively online instruction to all

---

[10] *COVID-19 Statewide Update*, STATE OF CAL., https://update.covid19.ca.gov (last updated July 10, 2020).
[11] *Daily State-by-State Testing Trends:California*, Johns Hopkins University & Medicine Coronavirus Research Center, https://coronavirus.jhu.edu/testing/individual-states/california (last visited July 10, 2020).
[12] https://www.law.uci.edu/news/press-releases/2020/fall-2020-semester-planning-update-06232020.pdf
[13] https://www.law.berkeley.edu/article/fall-instruction-memo-6-26-20/
[14] https://www.bostonherald.com/2020/07/06/all-harvard-university-students-will-take-online-classes-this-fall-amid-coronavirus/
[15] https://coronavirus.usc.edu/2020/07/01/7-1-letter-on-student-housing-and-course-schedules/

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

students. Massachusetts Institute of Technology[16] and Yale University[17] will bring some students back to campus for a handful of in-person classes, but most classes will be offered exclusively online. Other schools, like Brown University,[18] California Institute of Technology,[19] and Johns Hopkins University,[20] have not yet announced their plans.

38.   Schools are right to be cautious. Public health leaders believe the United States is still contending with the first wave of coronavirus infections.[21] Most public health experts expect that, even if the first wave is eventually contained, a second wave of infections will take hold in the fall or winter.[22]

### **The F-1 Student Visa Program**

39.   The United States has labeled students as "non-immigrants" and operated a student visa program since at least 1921.[23] Although the F-1 program has changed over the years, millions of students have entered the country with F-1 visas since at least 2000, as far back as public records are available.[24]

40.   For the Fall 2019 term, there are currently 44,485 international students in the University of California ("UC") system. 27,189 of those are undergraduate students, and 17,295 are graduate students.[25]

41.   According to a report published by the U.S. Immigration and Customs Enforcement ("ICE"), the total number of Student and Exchange Visitor Information System ("SEVIS") records for active F-1 and M-1 students was 1,551,373 in the calendar year 2018. Asia remains the number-one continent of origin for

---

[16] https://covid19.mit.edu/further-decisions-about-the-fall-semester
[17] https://covid19.yale.edu/announcements/fall-2020
[18] https://covid.brown.edu/updates/brown-students-postponing-preregistration-until-august-updating-coursesbrown
[19] https://coronavirus.caltech.edu/updates/general/6252020
[20] https://covidinfo.jhu.edu/university-messages-and-announcements/planning-for-fall-and-beyond/
[21] https://www.hopkinsmedicine.org/health/conditions-and-diseases/coronavirus/first-and-second-waves-of-coronavirus
[22] https://www.ama-assn.org/delivering-care/public-health/harvard-epidemiologist-beware-covid-19-s-second-wave-fall
[23] https://web.archive.org/web/20140205165423/http://www.iie.org/Who-We-Are/History
[24] https://travel.state.gov/content/travel/en/legal/visa-law0/visa-statistics.html
[25] https://www.universityofcalifornia.edu/infocenter/fall-enrollment-glance

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

nonimmigrant students, with 1,165,483 student records. China (478,732), India (251,290), and South Korea (88,867) sent the largest numbers of students in both calendar years 2017 and 2018.[26]

42.    There were 145,564 Optional Practical Training ("OPT") students in the calendar year 2018, including 69,650 science, technology, engineering, and mathematics ("STEM") OPT students.[27] There were 151,525 curricular practical training ("CPT") students who reported working for an employer in the calendar year 2018, a 14-percent increase since 2017.[28]

43.    In 2018, California hosted 302,073 nonimmigrant students, 19.5 percent of all nonimmigrant students in the United States, and more than any other state.[29]

### SEVP's Response to the COVID-19 Pandemic

44.    On March 9, 2020, the Student and Exchange Visitor Program ("SEVP") issued a Broadcast Message providing guidance on COVID-19 and its implications for nonimmigrant F and M students ("March 9 Guidance"). In this guidance, SEVP recognized that "SEVP-certified schools may need to adapt their procedures and policies to address the significant public health concerns associated with the COVID-19 crisis." SEVP provided schools with a template that schools could use to report those changes to SEVP. SEVP assured schools and students, however, both that "SEVP is focused on ensuring that nonimmigrant students are able to continue to make normal progress in a full course of study as required by federal regulations," and that "SEVP intends to be flexible with temporary adaptations." SEVP further recognize[d] that the COVID-19 crisis is fluid and rapidly changing" and "[f]or that reason" assured schools that it was "leaving room for schools to comply with state or local health emergency declarations."

---

[26] https://www.ice.gov/doclib/sevis/pdf/sevisByTheNumbers2018.pdf
[27] *Id.*
[28] *Id.*
[29] *Id.*

45.     On March 13, 2020, President Donald J. Trump declared that COVID-19 had created a national emergency.[30] This emergency is ongoing.

46.     On March 13, 2020, as governors across the country began to sign stay-at-home orders and many institutions of higher education began to switch to remote-teaching options, the SEVP issued a follow-up to the March 9 Guidance ("March 13 Guidance") addressing "inquiries" that SEVP had received about various "different scenarios" a school or student might face, and instructing schools and students how the transition to online classes would affect nonimmigrant students' visa status.[31]

47.     The March 13 Guidance presented students with three scenarios they might face: a complete school shutdown, a switch to online learning while the student remained in the United States, and a switch to online learning while the student moved outside of the United States.[32] In all three scenarios, SEVP assured students that they would be able to remain in compliance with the terms of their visas.

48.     SEVP assured students and schools that it would treat school shutdowns the same way it treated "short-term breaks in the school calendar." International students would remain eligible for their visas if they "intend[ed] to resume their course of study when classes resume."[33]

49.     For institutions that switched to online education, and "[g]iven the extraordinary nature of the COVID-19 emergency," SEVP waived the limits for online courses laid out in 8 C.F.R. §§ 214.2(f)(6)(i)(G) and 214.2(m)(9)(v). SEVP waived these limits for both international students who remained in the United States and those who chose to travel abroad during the period of online instruction.[34] SEVP explained that these waivers would remain in place for "the duration of the [COVID-19] emergency . . . ."

---

[30] https://www.whitehouse.gov/presidential-actions/proclamation-declaring-national-emergency- concerning-novel-coronavirus-disease-covid-19-outbreak
[31] https://www.ice.gov/sites/default/files/documents/Document/2020/Coronavirus%20Guidance_3.13.20.pdf
[32] *Id.*
[33] *Id.*
[34] *Id.*

50.     At the end of the March 13 Guidance, SEVP noted that "[d]ue to "the fluid nature of this difficult situation, this guidance may be subject to change." Nowhere in the March 13 Guidance, however, did SEVP suggest or even hint that it intended to change the values that underlay the March 9 and March 13 guidance, such as to abandon the "focus" it had announced, just six days before, on "ensuring that nonimmigrant students are able to continue to make normal progress in a full course of study." March 9 Guidance.  Similarly, nowhere in the March 13 Guidance did SEVP suggest or hint that it no longer "intend[ed] to be flexible with temporary adaptations" or would deny schools "room … to comply with state or local health emergency declarations." March 9 Guidance.  To the contrary, SEVP made clear that it planned to monitor factual changes in the COVID-19 situation: "SEVP will continue to monitor the COVID-19 situation and will adjust its guidance as needed."

51.     On March 20, 2020, ICE posted links to the March 9 and March 13 guidance documents on its website together with some sample Questions and Answers geared to be helpful to students. One such Q and A read:

"Can nonimmigrant students participate in online classes?

"*SEVP is committed to remaining flexible* in allowing schools to make temporary procedural adaptations *so nonimmigrant students can continue to make normal forward progress* in their program of study. They can temporarily engage in distance-learning, either from within the U.S. or outside the country, in light of COVID-19. SEVP will provide updated guidance *as additional* information concerning the scope and length of this situation becomes clearer."  (Emphasis added.)

52.     For the four months following the release of the March 9 and March 13 guidance documents, students and schools engaged in extensive efforts to plan for the fall academic year, trusting that SEVP's March 9 Guidance and March 13 Guidance, as reiterated in the other communications, accurately reflected the approach that SEVP

would take to the visa status of international students during the COVID-19 emergency.

53.     The nation's COVID-19 emergency is not over.  President Trump has not withdrawn the declaration of a national state of emergency.  In California, COVID-19 infection and death rates remain consistent with—and indeed are exceeding—the levels when the March Guidances were issued, as noted above.

54.     Yet on July 6, 2020, SEVP suddenly and without notice announced a rollback of the exemptions put in place for the spring and summer 2020 terms.[35]

55.     The new guidelines ("July 6 Guidelines") require students whose institutions choose to conduct the fall 2020 term entirely online to exit the United States. The announcement states that:

> Nonimmigrant F-1 and M-1 students attending schools operating entirely online may ***not*** take a full online course load and remain in the United States. The U.S. Department of State will not issue visas to students enrolled in schools and/or programs that are fully online for the fall semester nor will U.S. Customs and Border Protection permit these students to enter the United States. Active students currently in the United States enrolled in such programs must depart the country or take other measures, such as transferring to a school with in-person instruction to remain in lawful status. If not, they may face immigration consequences including, but not limited to, the initiation of removal proceedings.[36]

56.     The July 6 Guidelines also made clear that students whose in-person classes were switched online partway through the term would be required to leave the United States:

> Schools should update their information in the Student and Exchange Visitor Information System (SEVIS) within 10 days of the change if they begin the fall semester with in-person classes but are later required to switch to only online classes, or a nonimmigrant student

---

[35] https://www.ice.gov/news/releases/sevp-modifies-temporary-exemptions-nonimmigrant-students-taking-online-courses-during

[36] *Id.*

19

changes their course selections, and as a result, ends up taking an entirely online course load. Nonimmigrant students within the United States are not permitted to take a full course of study through online classes. If students find themselves in this situation, they must leave the country or take alternative steps to maintain their nonimmigrant status such as a reduced course load or appropriate medical leave.[37]

57.     The July 6 Guidelines further bar students whose institutions have gone either hybrid or in-person from taking a fully online curriculum:

These schools must certify to SEVP, through the Form I-20, "Certificate of Eligibility for Nonimmigrant Student Status," certifying that the program is not entirely online, that the student is not taking an entirely online course load this semester, and that the student is taking the minimum number of online classes required to make normal progress in their degree program.

58.     Nowhere in the July 6 Guidelines does SEVP state that the COVID-19 emergency has ended, whether as a formal or a factual matter.  Indeed, the July 6 Guidelines are entirely silent on "the COVID-19 situation" that SEVP had said it was planning to monitor and would make the basis of any change in guidance.

59.     Nowhere in the July 6 Guidelines does SEVP acknowledge its prior commitment, in the March 9 Guidance, to allow international students "to make normal progress in a full course of study," "to be flexible with temporary adaptations," or allow schools "room … to comply with state or local health emergency declarations."

60.     Nowhere in the July 6 Guidelines does SEVP give any consideration to the reliance that international students and schools may have placed, in making their respective plans for the coming academic year, on the March 9 and March 13 guidance documents, on the nation's longstanding commitment to the F-1 Visa program, and on the expectation that any changes SEVP would announce to the March

---

[37] *Id.*

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

9 and 13 guidance would reflect a good-faith assessment of materially changed circumstances in light of the values expressed in those documents.

61.     The July 6 Guidelines thus reflect a complete but unacknowledged repudiation of the approach SEVP laid out on March 9 and March 13 to addressing the implications of the COVID-19 pandemic for holders F-1 and M-1 visas.

62.     The July 6 Guidelines also fail to address numerous important issues that any reasoned decision would consider.  For example, the July 6 Guidelines do not include an exception for students who cannot attend classes because they are at an elevated risk to COVID-19 due to pre-existing health conditions, nor do they contain an exception for students living with family members or roommates who are at an elevated risk to COVID-19.

63.     The July 6 Guidelines also do not include an exception for students who are forced into online classes because the state institutes a stay-at-home order that shuts down their educational institution.

64.     The July 6 Guidelines also do not include an exception for students who are forced to come back to the United States because their schools have gone hybrid or remained in-person.

65.     The July 6 Guidelines also do not include an exception for students who cannot access the internet in their country of origin, for students who cannot safely travel or who cannot travel at all to their country of origin, or for students who fear suffering injury or death if they return to their country of origin.

66.     In summary, the July 6 Guidelines completely abandon, without explanation, both the substantive guidance SEVP provided on March 9 and March 13 and the approach SEVP announced it would take to considering any changes to that guidance.  The July 6 Guidelines also ignore the public-health-informed decisions of schools and government officials to limit or cease in-person teaching. They do not include a safety valve for even the worst coronavirus outbreaks. They do not allow for

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

any of the flexibility necessary to safely manage an increasingly dangerous pandemic. The July 6 Guidelines do nothing but expel students from the United States because of circumstances outside of the students' control, no matter the consequences for the students, the schools, or the country.

67.     Students at schools that have not yet announced their fall plans do not know if the July 6 Guidelines apply to them or whether they will be able to remain in the United States for the fall term.

68.     Even students at schools who have announced some in-person course offerings may not have not yet assigned students to classes. International students at these schools do not know if they will be able to enroll in an in-person class, a necessity of continuing to study in the United States under the July 6 Guidelines. Some of these schools do not finalize class schedules until after the beginning of the academic term, creating a possibility that students will be required to leave the United States in the middle of the semester.

69.     In a Broadcast Message released on the same day as the July 6 Guidelines, SEVP stated that schools are required to notify SEVP if they intend to only offer remote instruction by July 15, 2020.[38] Schools choosing to offer some in-person instruction are required to notify SEVP by August 1. If a school decides or is required to cease in-person instruction over the course of the semester, it must notify SEVP of that change within 10 calendar days.

70.     The SEVP has not provided an explanation for its departure from the March 9 and March 13 guidance documents

71.     But on July 7, Ken Cuccinelli, the Senior Official Performing the Duties of the Deputy Secretary of Homeland Security ("DHS") and the Senior Official Performing the Duties of the Director of the United States Citizenship and Immigration Services ("USCIS"), made clear his views about students enrolled in

---

[38] https://www.ice.gov/doclib/sevis/pdf/bcm2007-01.pdf

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

online courses, or enrolled at institutions offering only online courses. "There isn't a reason for a person holding a student visa to be present in the country . . . they don't have a basis to be here. . . . I don't frankly follow why a student visa holder would be here if their school isn't functioning."[39]

72.     On July 6, at 2:40 p.m. Eastern Time, President Donald Trump tweeted his support for the opening of schools by stating, "SCHOOLS MUST OPEN IN THE FALL!!!"[40]

73.     President Trump continued to pressure other institutions beyond universities to open in the fall by threatening to cut funding otherwise.[41]

74.     At 4:11 p.m., he accused the Democratic Party and the presidential candidate Joe Biden of supporting closure of schools for political reasons and not health reasons.[42]

### The Effects of the July 6 Guidelines on International Students

75.     Plaintiffs either attend schools that are exclusively offering online education in the fall to all students or to students similarly situated to plaintiffs.

76.     It is impossible for students to transfer to a different law school for the start of the fall 2020 term. Even if it were possible to transfer, it would be impractical to move, perhaps across the country, in the midst of the COVID-19 pandemic.

77.     Under the July 6 Guidelines, plaintiffs will have no choice but to leave the United States. They will be ripped from their communities and their academics. Their carefully-laid financial, health, employment, immigration, and personal plans—made under the assumption that SVEP would not revoke its March 13 Guidance for the "duration of the emergency"—will be upended.

---

[39] https://www.mediaite.com/tv/watch-ken-cuccinelli-and-cnns-brianna-keilar-battle-in-absurd-20-minute-debate-on-immigration-covid-and-confederate-flags/
[40] https://twitter.com/realDonaldTrump/status/1280209946085339136
[41] https://www.nytimes.com/2020/07/08/us/politics/trump-schools-reopening.html
[42] https://twitter.com/realDonaldTrump/status/1280232979781111808

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

*Housing*

78.     Some plaintiffs have signed leases and acquired housing under the assumption that they would be present in the United States during the fall term. If the July 6 Guidelines are enforced and these plaintiffs are forced to leave the United States, these plaintiffs will either have to break their lease and lose their security deposits, which would result in a loss to their credit score, or continue to pay rent until the lease terminates.

79.     Plaintiffs will likewise have to procure housing in their country of origin. While some plaintiffs may be able to live with family, others have no safety net in that country, and will be forced to find housing with adequate internet connections and access to study space with little notice, perhaps before they leave the United States.

80.     When some plaintiffs relocated to the United States to enter their respective academic programs, they brought all of their belongings and livelihoods. Because they justifiably expected to remain in the United States for years of education, they did not build a safety net in their countries of origin. They terminated their housing, sold their furniture, and gave away the belongings that they could not bring with them to the United States. These plaintiffs do not have a ready-made home in their respective home countries.

81.     If schools reopen in the spring, plaintiffs who were forced to leave the United States under the July 6 Guidelines will be forced to return to the United States, likely on short notice, in order to maintain their visa status.

82.     These students, who may have abandoned the housing they secured for the fall term because of the July 6 Guidelines, will find it difficult or impossible to secure adequate, affordable housing. When it comes to signing leases, plaintiffs often do not have the luxury of choice. Foreign students often do not have robust credit scores because of their shorter credit histories and newer bank accounts. Any abandonment of housing secured for the fall semester only accentuates these problems

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

– as does the possibility of having to find housing remotely in their institution's city with only a few weeks' notice once spring term plans are announced.

*Travel*

83.     The COVID-19 pandemic affects countries worldwide. Multiple countries have shut down their borders and banned all transnational flights. Others have specifically barred flights from the United States. Plaintiffs attempting to comply with the July 6 Guidelines may not be able to find flights back to their home countries.

84.     Even if each plaintiff is able to find a flight itinerary that will eventually take her home, that itinerary will necessarily include multiple stops over different continents.

85.     This itinerary is not simply inconvenient. It is a health risk. As an airline passenger, the plaintiff would spend hours in a confined space surrounded by shared surfaces - exactly the kind of prolonged exposure that creates substantial risk of contracting the novel coronavirus.  This is in addition to the added risks associated with airports, whether it be standing in security lines or waiting at the gate to board an aircraft.

86.     Such an itinerary is also exorbitantly, perhaps prohibitively, expensive. As noted above, airfare may exceed $10,000 – especially given the need to book on short notice. In addition, for students returning to countries, such as China, that have imposed a quarantine on incoming travelers, the students would have to pay for 14 days' lodging while they quarantine.

87.     If a plaintiff's academic institution decides to permit in-person teaching in the spring semester, Plaintiffs will have to once again pay for another set of flights and expose themselves to other travelers in order to return to the United States.

88.     The financial and logistical challenges that Plaintiffs face multiply for international students with dependents.

*Health Risks*

89.     Forcing students to return to their countries of origin does more than put them at increased risk of exposure to the novel coronavirus during transit. In order to accommodate the course schedule and participate in extracurricular activities, plaintiffs, some of whom will not be given the option of asynchronous class participation, will be forced to maintain irregular sleep schedules.[43] These sleep schedules will put students at a disadvantage compared to their peers, which poses a particular harm to plaintiff in classes that are graded on a curve.

90.     Plaintiffs are also burdened with health insurance costs. Many plaintiffs have already paid for their 2020–2021 health insurance plans through their university—plans that will do nothing for them in their country of origin. These plaintiffs may need to buy health insurance in their home countries. Foregoing health insurance during the pandemic is not a realistic nor preferred option for plaintiffs. However, given the costs associated with health insurance and the price of their now-useless American insurance, plaintiffs may go uncovered.

*Education Inequities*

91.     The July 6 Guidelines make it difficult or impossible for plaintiffs to participate fully in class. Students in different time zones are forced to choose between attending online classes in the middle of the night or watching recorded classes.[44] Students watching recordings will be harmed because they cannot ask questions during class, participate in class discussion, or otherwise have a visible presence. But students who attempt to participate as the class occurs must stay alert for two to three hours of lecture at inopportune times, often in the middle of the night. Either way,

---

[43] https://www.tandfonline.com/doi/full/10.1080/09291016.2015.1103942; https://mail.google.com/mail/u/1/#inbox/FMfcgxwJWjBjvRFDqNrMVnNJctWDlNWW?projector=1&messagePartId=0.1
[44] *See, e.g.*, Kelsey J. Griffin, *Hundreds of Harvard Law Students Criticize Plans for Online Fall Semester*, Harv. Crimson (June 17, 2020, 9:11 PM), https://www.thecrimson.com/article/2020/6/17/hls-online-fall-semester/.

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

students will be put at a substantial disadvantage compared to their classmates taking the same class during normal hours.

92.     Forcing plaintiffs to return to their countries of origin will severely limit their practical learning opportunities. In law school, meeting and communicating with clients, supervisors, and team members constitute a large part of clinical experience. While any remote learning complicates these experiences, substantial time differences like those faced by plaintiffs make them almost impossible. For example, many clinical students have trouble scheduling meetings with clients who lack access to technology when they all reside in the same city; these meetings simply will not occur when the student attorney and the client must contend with a 16-hour difference.

93.     The same applies to pro bono opportunities, many of which involve client intake interviews or group work. Limited pro bono opportunities will disadvantage international students, as some law schools confer graduation honors based on the number of pro bono hours completed.[45]

94.     For some plaintiffs, participating in online classes in their countries of origin may not be an option at all. Internet access, which is absolutely necessary for remote learning, is not guaranteed in some countries. Some countries have restricted internet access while others, like Ethiopia,[46] block it altogether. Without adequate internet access, students cannot take online classes at all.

95.     Other countries heavily monitor internet activity and curtail access to some resources. Beyond potentially exposing students to government harassment because of the contents of their studies, these restrictions will make it difficult or impossible for students in these countries to continue their studies.

---

[45] *See, e.g.*, *Pro Bono Program Code and Guidelines*, UCI Law, https://www.law.uci.edu/about/public-service/public-interest/probono/program-guidelines.html (last visited July 8, 2020).

[46] Bethlehem Feleke, *Internet Cut Off in Ethiopia amid Outcry over Death of Singer-Activist*, CNN (June 30, 2020, 2:59 PM), https://www.cnn.com/2020/06/30/africa/ethiopia-singer-killing-sparks-protest-intl/index.html.

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

96.    China, for example, limits access to Google web products.[47] Many schools, including UC Irvine, use Google products like Gmail and Google Drive to communicate and collaborate on academic and clinical assignments – and this is even more true now that teaching has moved online. If students cannot access these resources, they will be locked out of their education.[48]

*Immigration Consequences*

97.    The July 6 Guidelines prevents students whose schools will operate entirely online from applying for Curricular Practical Training ("CPT") and Optional Practical Training ("OPT") visa programs. CPT allows international students to work in their field of study while they are enrolled in their academic program.[49] OPT allows students to work in the United States for one year after graduation.[50] To be eligible for OPT, students must have been enrolled in school full-time for one year, maintain valid F-1 status, and be physically present in the United States at the time of application.[51] Cancelling the F-1 visa or forcing international students to return to their countries of origin will make these students ineligible for CPT and will prevent them from applying to OPT.

98.    Some international students have applied for permanent resident status, better known as the green card, and are waiting for approval. Plaintiffs are concerned that the new SEVP rule may extend the waiting time for students who must leave the United States because their schools will operate entirely online.

---

[47] https://www.businessinsider.com/major-us-tech-companies-blocked-from-operating-in-china-2019-5

[48] Virtual Private Networks ("VPNs"), the typical solution to internet tracking and restrictions imposed by authoritarian regimes, are heavily restricted in China. Because only government-approved VPNs are accessible, the VPN does nothing to secure against government intrusion. *See https://www.techradar.com/news/coronavirus-sees-china-crack-down-on-vpns*. And, in plaintiffs' experience, the VPNs which are available so severely throttle internet speeds that video chat – necessary to participate in online courses – is almost impossible to use.

[49] *F-1 Curricular Practical Training (CPT)*, Berkeley Int'l Office, https://internationaloffice.berkeley.edu/students/employment/cpt (last visited July 8, 2020).

[50] *Optional Practical Training (OPT) for F-1 Students*, U.S. Citizenship & Immigration Servs., https://www.uscis.gov/opt (last updated Apr. 22, 2020).

[51] *Id.*; *see also F-1 Optional Practical Training (OPT)*, Berkeley Int'l Office, https://internationaloffice.berkeley.edu/students/employment/opt (last visited July 8, 2020).

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

*Inequities in Employment Opportunities*

99.    Because of the risks associated with COVID-19, law schools across the nation have postponed to January their On-Campus Interviews (OCI), a yearly event where law firms travel to law school campuses to interview and recruit students for summer associate positions and eventual full-time employment. OCI is a competitive and important process for students.

100.   The July 6 Guidelines, however, deny plaintiffs the opportunity to physically attend OCI or fully participate in OCI. If schools hold OCI in person, Plaintiffs are practically blocked from participating because Plaintiffs will be required to find flights, find housing, self-quarantine, and ensure that they are free from COVID-19—if they are eligible to enter the United States at all.

101.   If schools decide to hold virtual OCI, plaintiffs have to interview in the middle of the night and compete against domestic students who are interviewing in normal business hours.

102.   Furthermore, employers will easily be able to identify the immigration status of plaintiffs. By simply asking about the time zone or city that plaintiffs are in, employers can filter out international students among their interviewees. Due to the additional cost and precarious nature of sponsoring foreign nationals, some employers may avoid hiring international students for summer associate positions.[52]

## CLAIMS FOR RELIEF

### Count 1: (Violation of Administrative Procedure Act, 5 U.S.C. §706)

**The July 6 Guidelines are Arbitrary and Capricious Both Because They Fail to Adequately Consider the Reliance Interests of Millions of F-1 and M-1 Visa Holders and Because They Fail to Provide a Reasoned Explanation.**

103.   Plaintiffs incorporate the allegations contained in the preceding paragraphs.

---

[52] The disadvantages imposed to international students who are not participating in OCI are similar to Plaintiffs' disadvantages. The students will still have to interview in odd hours via Zoom and will indirectly disclose their immigration status.

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

104.   The APA requires this Court to "hold unlawful and set aside agency action, findings, and conclusions found to be…arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. §706(2)(A). Agency action must be the result of reasoned analysis. *Motor Vehicle Mfrs. Ass'n of United States, Inc. v. State Farm Mu. Auto. Ins. Co.*, 463 U.S. 29, 57 (1983).

105.   This standard applies even when an agency is altering existing guidance. When an agency changes course, the agency must "be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account." *Encino Motorcars LLC v. Navarro*, 136 S. Ct. 2117, 2120 (2016).

106.   As noted above, the United States has a long history of inviting international students to study as "non-immigrants" pursuant to a student visa program. International students admitted to well-established and high-quality institutions, such as those in the UC system, often have multiple options available to them. They choose to come study in the United States in reliance on the integrity of the visa program and the expectation that their student visas will remain valid as long as they are committed to their studies at their academic institutions.

107.   The March 9 and March 13 guidance documents set forth a reasonable framework for addressing the implications of COVID-19 for F-1 and M-1 visas, as well as for updating the guidance in light of changes to the COVID-19 situation.  The July 6 Guidelines identify no material changes to the COVID-19 situation since March 13, and ignore entirely the approach and rationale underlying the March 9 and March 13 guidance documents.

108.   The July 6 Guidelines ignores the assurances SEVP has made to hundreds of thousands of students for well over twenty years that, as long as they remain in compliance with their academic programs, they will be able to remain in the United States at the institutions where they study.

109.   The July 6 Guidelines also ignore the reasonable reliance that students and schools alike placed in the approach to reconciling the impact of COVID-19 on F-1 and M-1 visa requirements set forth in the March 9 and March 13 guidance documents.

110.   The Supreme Court has recently emphasized that agencies modifying a previous policy are "required to assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns." *Department of Homeland Security v. Regents of Univ. of California* 591 U.S. ___ (slip op., at 26) (2020).

111.   The July 6 Guidelines are arbitrary and capricious because they fail to consider these important reliance interests. Revoking international students' visas when the students have done everything in their power to remain in compliance with U.S. immigration law in the midst of a pandemic—and after SEVP announced at the outset of the pandemic that the United States would honor these visas during the pandemic despite the shift to online classes—disregards the reliance interests of these students in maintaining their visa status and their ability to continue studying in the United States. The long history of the United States' F-1 visa program, together with the SEVP's March 13 announcement, created a reasonable and justifiable expectation among students that they could maintain their visa status so long as they progressed in their particular course of study in whatever way that course of study was offered by their academic institution.

112.   The reliance interests of F-1 visa holders extend further still.  As discussed above, plaintiffs have executed leases worth thousands of dollars for the upcoming school year. Many have paid for expensive health insurance plans that are now useless. Many will be forced to store or abandon property in the United States if they are required to exit the country on short notice. Many would not have paid tens of

thousands of dollars in tuition to American universities had they known they could not be present in the country for the fall term.

113.   This reliance was justifiably premised on SEVP's March 9 and March 13 guidance. For example, the March 13 guidance advised F-1 Visa holders that the spring 2020 exemptions from online learning restrictions would exist "in effect for the duration of the emergency."

114.   Apart from the failure to address reliance interests, an agency's failure to provide "reasoned analysis" for this sudden change in policy is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. §706(2)(a). Here, the July 6 Guidelines fail to offer any reasonable consideration of the painful consequences of the Guidelines for students, schools, and communities. For example, the Guidelines contain no discussion of the implications of this new policy for public health, of the status of the COVID-19 situation and how it is different now than it was in March in a way that is material for this guidance, or of how and why this guidance better serves the purposes of the F-1 visa program, such as allowing "students to make normal forward progress in their studies," than does the prior guidance.  The Guidelines lack even an acknowledgment of, let alone a justification for, the extraordinary human suffering they will cause.

115.   For these reasons and others, the July 6 Guidelines must be vacated and "set aside" as "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

**Count II: (Violation of Administrative Procedure Act, 5 U.S.C. §§ 553,706) The July 6 Guidelines Violates the APA's Notice-And-Comment Requirements.**

116.   Plaintiffs incorporate the allegations contained in the preceding paragraphs.

117.   The APA requires this Court to hold unlawful and set aside any agency action taken "without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

118.   The APA, 5 U.S.C. § 553, requires that any agency desiring to implement a rule go through the process of notice-and-comment in order to give the agency the benefit of the expertise of those most impacted by the potential rule-making.

119.   The July Guidelines did not go through any such process. Instead, DHS plans to "publish the procedures and responsibilities in the Federal Register as a Temporary Final Rule."[53]

120.   The July 6 Guidelines formalize a reversal of previous ICE guidance and thus is subject to notice and comment requirements. They are not an interpretive rule that could be issued without notice and comment requirements. *Mt. Diablo Hospital Dist. v. Bowen*, 860 F.2d 951, 956 (9th Cir. 1988).

121.   DHS has failed to provide any "good cause" that would justify bypassing the notice and comment period. 5 U.S.C. §553 (b)(3)(B) The good cause exception is only available to agencies if the agency has "good cause" to believe the process would be "impracticable, unnecessary, or contrary to the public interest." *Western Oil & Gas Ass'n v. U.S. Environmental Protection Agency*, 633 F.2d 803, 810 (9th Cir. 1980).

122.   The agency has yet to "publish[] reasons for thinking" the good cause applies to the rules in question. *Id.*

123.   DHS has failed to demonstrate how threatening to deport over one million students in the middle of a global pandemic could possibly qualify as good cause.

124.   By promulgating the July 6 Guidelines without notice and comment, ICE violated 5 U.S.C. § 553 and § 706. The modifications it announced are unlawful and must be vacated.

---

[53] https://www.ice.gov/news/releases/sevp-modifies-temporary-exemptions-nonimmigrant-students-taking-online-courses-during

**Count III: (Violation of the Due Process Clause of the Fifth Amendment)**

**The July 6 Guidelines Deprive Plaintiffs of their Visa Status Without Due Process of Law.**

125.   Plaintiffs reallege and incorporate by reference each and every allegation contained in the preceding paragraphs.

126.   Due process protections extend to "all 'persons' within the United States, including [non-citizens], whether their presence here is lawful, unlawful, temporary, or permanent." *Zadvydasv. Davis*, 533 U.S. 678, 693 (2001). Nonimmigrant students are lawfully present in this country.

127.   Nonimmigrant students have significant liberty and property interests, protected by the Due Process Clause, in their visas and/or access to educational programs to which they have been admitted and in which they have invested time, energy, and money.  The "very essence" of due process is the "protection of the individual against arbitrary action." *Board of Regents of State Colls. v. Roth*, 408 U.S. 564, 584 (1972). The July 6 Guidelines are so arbitrary, both in substance and the manner in which they were implemented, that they unlawfully deprive Plaintiffs of their constitutionally protected liberty and property interests.

128.   As a result of the foregoing constitutional violations, Plaintiffs will suffer irreparable injury.

## **PRAYER FOR RELIEF**

Wherefore, Plaintiffs respectfully seek the following relief:

1.     A declaration that the policy announced in the July 6 Guidelines is unlawful and unlawfully promulgated;

2.     A temporary restraining order and preliminary and permanent injunctive relief preventing Defendants from enforcing the policy announced in July 6 Guidelines, or promulgating it as a Final Rule;

/ / /

/ / /

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

3.     An order vacating and setting aside the policy announced in the July 6 Guidelines and reinstating the March 13 Guidance;

4.     An order awarding Plaintiffs their costs and attorneys' fees; and

5.     Any and all other such relief as the Court may deem appropriate.


DATED: July 10, 2020          By:  /s/ *David R. Carpenter***
                                   Lisa M. Gilford
                                   David R. Carpenter
                                   Stacy Horth-Neubert
                                   SIDLEY AUSTIN LLP

                              By:  /s/ *Mark D. Rosenbaum*
                                   Mark D. Rosenbaum
                                   PUBLIC COUNSEL

                              By:  /s/ *Evan Caminker*
                                   Dean Emeritus and Branch Rickey
                                   Collegiate Professor of Law
                                   University of Michigan Law School
                                   (Affiliation for identification
                                   purposes only)

                              By:  /s/ *Mark E. Haddad*
                                   USC Gould School of Law
                                   University of Southern California
                                   (Affiliation for identification
                                   purposes only)

                              Attorneys for Plaintiffs
                              Z.W., C.Y., X.Y., A.G., M.X., Z.L., W.R.,
                              and DOES 1-50.

** Filer attests that all signatories listed, and on whose behalf the filing is submitted, concur in the filing's content and have authorized the filing.

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF
ACTIVE 259040281