Mark D. Rosenbaum (SBN 59940)
mrosenbaum@publiccounsel.org
PUBLIC COUNSEL
610 South Ardmore Avenue
Los Angeles, CA 90005
Telephone: (213) 385-2977

Lisa M. Gilford (SBN 171641)
lgilford@sidley.com
David R. Carpenter (SBN 230299)
drcarpenter@sidley.com
Stacy Horth-Neubert (SBN 214565)
shorthneubert@sidley.com
SIDLEY AUSTIN LLP
555 West Fifth Street
Los Angeles, CA 90013
Telephone: (213) 896 6044
Facsimile: (213) 896 6600

*Additional Counsel Listed on Next Page*

Attorneys for Plaintiffs
Z.W., C.Y, X.Y., A.G., M.X., Z.L., W.R.,
and DOES 1 through 50

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION AT SANTA ANA

| | |
|---|---|
| Z.W., C.Y, X.Y., A.G., M.X., Z.L., W.R., and DOES 1 through 50, <br><br> Plaintiff, <br><br> vs. <br><br> U.S. DEPARTMENT OF HOMELAND SECURITY; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; CHAD R. WOLF, Acting Secretary, U.S. Department of Homeland Security; MATTHEW ALBENCE, Acting Director, U.S. Immigration and Customs Enforcement, <br><br> Defendant. | Case No.  8:20-CV-01220 CJC (KESx) <br><br> Assigned to: Hon. Cormac J. Carney <br> Magistrate Judge: Karen E. Scott <br><br> **PLAINTIFFS' APPLICATION FOR TEMPORARY RESTRAINING ORDER; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF** |

Sheri Porath Rockwell (SBN 165726)
sheri.rockwell@sidley.com
SIDLEY AUSTIN LLP
1999 Avenue of the Stars, 17th Floor
Los Angeles, CA 90067
Telephone: (310) 595-9500

Evan Caminker (*pro hac vice forthcoming*)
caminker@umich.edu
Dean Emeritus and Branch Rickey Collegiate Professor of Law
University of Michigan Law School*
701 South State Street, 3250 South Hall
Ann Arbor, MI  48109-1215
Telephone: (734) 763-5221

Mark E. Haddad (SBN 205945)
markhadd@usc.edu
USC Gould School of Law*
UNIVERSITY OF SOUTHERN CALIFORNIA
699 Exposition Blvd.
Los Angeles, CA  90089
Telephone:  (213) 675-5957

*\* University affiliation provided
for identification purposes only*

# TABLE OF CONTENTS

APPLICATION ...................................................................................................... 5

INTRODUCTION ................................................................................................. 8

BACKGROUND ................................................................................................. 10

    **A.**    The F-1 Student Visa Program and Its Goal of Attracting International Students to Study in the United States ...................................................... 10

    **B.**    The COVID-19 Crisis, and SEVP's Initial, Appropriate Response ........ 11

    **C.**    The COVID-19 Emergency Continues, Yet Defendants Abruptly Change Course to Require In-Person Instruction ................................................ 13

    **D.**    Plaintiffs Are International Students Who Will Be Irreparably Harmed by the Policy Change ................................................................................... 15

LEGAL STANDARD ......................................................................................... 19

ARGUMENT ...................................................................................................... 20

**I.**    PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS .................. 20

    **A.**    The July 6 Policy Change Is Arbitrary and Capricious, in Violation of the APA. .................................................................................................... 20

        **1.**    Defendants Failed to Adequately Consider the Reliance Interests of Student Visa Holders. .................................................................. 21

        **2.**    Defendants Failed to Provide a Reasoned Explanation. ................. 23

    **B.**    The July 6 Policy Change Violates the APA's Notice-and-Comment Procedures. .......................................................................................... 27

**II.**    PLAINTIFFS WILL SUFFER IRREPARABLE HARM ABSENT EMERGENCY RELIEF ................................................................................ 30

**III.**    THE BALANCE OF HARDSHIPS AND PUBLIC INTEREST TIP SHARPLY IN FAVOR OF EMERGENCY RELIEF .................................................... 31

CONCLUSION .................................................................................................. 32

1

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Amerijet Int'l, Inc. v. Pistole*,
  753 F.3d 1343 (D.C. Cir. 2014)...........................................................................22

*Bennett* v. *Spear*,
  520 U.S. 154 (1997)...............................................................................................23

*Board of Regents of State Colleges v. Roth*,
  408 U.S. 564 (1972)...............................................................................................31

*Cedars-Sinai Med. Ctr. v. Shalala*,
  939 F. Supp. 1457 (C.D. Cal. 1996) ....................................................................30

*Chew v. Colding*,
  344 U.S. 590 (1953)...............................................................................................31

*Cty. of Sacramento v. Lewis*,
  523 U.S. 833 (1998)...............................................................................................30

*Dep't of Commerce v. New York*,
  139 S. Ct. 2551 (2019)..........................................................................................28

*Dep't of Homeland Security v. Regents of Univ. of Cal.*,
  140 S. Ct. 1891 (2020)..........................................................................10, 22, 23

*Disney Enters., Inc. v. VidAngel, Inc.*,
  869 F.3d 848 (9th Cir. 2017) ...............................................................................21

*East Bay Sanctuary Covenant*,
  950 F.3d 1242, 1280–81 (9th Cir. 2020) ............................................................34

*Encino Motorcars, LLC v. Navarro*,
  136 S.Ct. 2117 (2016)...................................................................................23, 24

*Hemp Indus. Ass'n v. Drug Enforcement Admin.*,
  333 F.3d 1082 (9th Cir. 2003) .............................................................................29

*Hernandez v. Sessions*,
  872 F.3d 976 (9th Cir. 2017) ...............................................................................21

*League of Wilderness Defenders v. Connaughton*,
  752 F.3d 755 (9th Cir. 2014) ................................................................. 33

*Mada-Luna v. Fitzpatrick*,
  813 F.2d 1006 (9th Cir. 1987) ............................................................. 29

*Michigan v. EPA*,
  135 S. Ct. 2699 (2015) ........................................................................ 26

*Moore v. City of East Cleveland Ohio*,
  431 U.S. 494 (1977) ............................................................................. 31

*Mora-Meraz v. Thomas*,
  601 F.3d 933 (9th Cir. 2010) ............................................................... 29

*Rodriguez v. Robbins*,
  715 F.3d 1127 (9th Cir. 2013) ............................................................. 34

*Sung v. Mc.Grath*,
  339 U.S. 33 (1950) ............................................................................... 31

*U.S. Army Corps of Engineers* v. *Hawkes Co., Inc.*,
  136 S. Ct. 1807 (2016) ........................................................................ 23

*Winter v. Nat. Res. Def. Council*,
  555 U.S. 7 (2008) ................................................................................. 21

*Zadvyadas v. Davis*,
  533 U.S. 678 (2001) ............................................................................. 30

**Statutes, Regulations, and Agency Materials**

5 U.S.C. § 551 ........................................................................................ 29

5 U.S.C. § 553 ........................................................................................ 29

5 U.S.C. § 702 ........................................................................................ 22

5 U.S.C. § 706 ....................................................................... 21, 22, 29, 30

8 U.S.C. § 1101(a)(15)(F)(i) .................................................................. 12

8 C.F.R. § 214.2(f) ...................................................................... 12, 14, 25

81 Fed. Reg. 13040 (Mar. 11, 2016) ............................................... 12, 13

3

Executive Order N-33-20 ................................................................................. 14

**Other References**

https://news.berkeley.edu/2020/03/09/as-coronavirus-spreads-uc-
    berkeley-suspends-in-person-instruction/; https://covid-
    19.ucla.edu/transitioning-ucla-to-online-instruction;
    https://coronavirus.usc.edu/2020/03/10/update-to-university-policies-
    and-plans .................................................................................................... 13

https://twitter.com/realDonaldTrump/status/1280209946085339136?s=20 ............... 11

https://www.gov.ca.gov/wp-content/uploads/2020/03/3.4.20-
    Coronavirus-SOE-Proclamation.pdf ...................................................... 13

https://www.ice.gov/doclib/sevis/pdf/sevisByTheNumbers2018.pdf ........................ 13

https://www.iie.org/Why-IIE/Announcements/2019/11/Number-of-
    International-Students-in-the-United-States-Hits-All-Time-High ......................... 13

https://www.whitehouse.gov/presidential-actions/proclamation-declaring-
    national-emergency-concerning-novel-coronavirus-disease-covid-19-
    outbreak/ ................................................................................................... 14

John Bowden, *Cuccinelli Says Rule Forcing International Students to
    Return Home Will 'Encourage Schools to Reopen*, The Hill (July 7,
    2020) .......................................................................................................... 11

Statement of Caroline Casagrande, Deputy Ass't Sec. Bureau of
    Educational and Cultural Affairs, U.S. Dept. of State, Apr. 22, 2020,
    https://educationusa.state.gov/us-higher-education-professionals/eca-
    das-casagrande-statement-academic-exchanges-and-covid19 ............................... 15

U.S. Dep't of State, EducationUSA, https://educationusa.state.gov/about-
    educationusa, https://educationusa.state.gov/educationusa-advising-
    centers ........................................................................................................ 12

United States Department of State, Global Level 4 Health Advisory – Do
    Not Travel (March 31, 2020),
    https://travel.state.gov/content/travel/en/traveladvisories/ea/travel-
    advisory-alert-global-level-4-health-advisory-issue.html ....................................... 18

**APPLICATION**

Plaintiffs are law students or graduate students at University of California Irvine School of Law, University of California Los Angeles, and the University of Southern California, who are currently studying in the United States on F-1 visas as part of the Student and Exchange Visa Program ("SEVP") administered by U.S. Immigration and Customs Enforcement under the authority of the Department of Homeland Security (collectively, "Defendants"). Each of Plaintiffs' schools has announced that, due to the ongoing (and worsening) COVID-19 crisis, instruction for Plaintiffs' fall semesters will be online only.

Under Guidance issued by SEVP in March, Plaintiffs would be able to continue living and studying in the United States for the fall semester. But on July 6, 2020, Defendants abruptly announced a policy change: if a school proceeds with online-only instruction for the fall semester, then SEVP students "must leave the country or take alternative steps to maintain their nonimmigrant status such as transfer to a school with in-person instruction." At this point, Plaintiffs have no feasible ability to transfer to a different school, and if forced to leave the United States would be subject to extreme financial hardship, health risks, and disruption to their courses of study.

On July 10, 2020, Plaintiffs filed a complaint challenging the July 6 policy change on the following grounds: (1) it is "arbitrary and capricious" in the violation the APA because Defendants failed to consider stakeholders' reliance interests on the prior policy, and because Defendants failed to provide a reasoned explanation; (2) it was improperly issued without meeting notice-and-comment requirements, also in violation of the APA; and (3) it violates the Due Process Clause. Plaintiffs now request a temporary restraining order ("TRO") enjoining the implementation of the July 6 policy change on the grounds that Plaintiffs are likely to succeed on the merits, Plaintiffs will suffer irreparable harm absent emergency relief, and the balance of hardships and public interest tip sharply in favor of Plaintiffs and maintaining the status quo.

1    On July 13, 2020, counsel for Plaintiffs Mark D. Rosenbaum met and conferred

2    by phone and email with counsel for Defendants, David M. Harris, Chief, Civil

3    Division, United States Attorney's Office, Central District of California. Mr. Harris

4    indicated Defendants were likely to oppose the Application.  The contact information

5    for Mr. Harris is: United States Attorney's Office, Central District of California,

6    Federal Building, Room 7516, 300 N. Los Angeles St., Los Angeles, California

7    90012; 213.894.8817; David.M.Harris@usdoj.gov.

8    This Application is based upon the accompanying Memorandum of Points and

9    Authorities and the supporting Declaration of Sheri Porath Rockwell and exhibits

10   thereto; the Declarations of Plaintiffs Z.W., C.Y., X.Y., A.G., M.X., Z.L., and W.R;

11   the Declaration of L. Song Richardson, Dean of University of California Irvine School

12   of Law; the Declaration of Sarah Zearfoss, Senior Assistant Dean and Director of the

13   Admissions Office at the University of Michigan Law School; the Declaration of Dr.

14   Ranit Mishori; the pleadings and argument of counsel; and such other matters that

15   may be presented to the Court and/or subject to judicial notice.

16

17   DATED: July 14, 2020                     By:  /s/ *David R. Carpenter*\*___

18                                                Lisa M. Gilford
                                                 David R. Carpenter
19                                               Stacy Horth-Neubert
                                                 Sheri Porath Rockwell
20                                               SIDLEY AUSTIN LLP

21
                                            By:  /s/ *Mark D. Rosenbaum*___
22                                               Mark D. Rosenbaum
                                                 PUBLIC COUNSEL
23

24                                          By:  /s/ *Evan Caminker*___
                                                 Dean Emeritus and Branch Rickey
25                                               Collegiate Professor of Law
                                                 UNIVERSITY OF MICHIGAN
26                                               LAW SCHOOL\*\*

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

By:  /s/ Mark E. Haddad
      USC Gould School of Law
      UNIVERSITY OF SOUTHERN
      CALIFORNIA**

Attorneys for Plaintiffs
Z.W., C.Y, X.Y., A.G., M.X., Z.L., W.R.,
and DOES 1 through 50

* Filer attests that all signatories listed, and on whose behalf the filing is submitted, concur in the filing's content and have authorized the filing.

** University affiliation provided for identification purposes only.

**INTRODUCTION**

Plaintiffs are among the hundreds of thousands of international students who have come to the United States as part of the Student and Exchange Visa Program ("SEVP"), where they have invested time, money, and energy into pursuing their degrees. When the COVID-19 crisis hit, SEVP initially responded appropriately. On March 9, 2020, it issued a guidance assuring visa students that they could remain in the country, even if their universities went to online-only instruction.[1] It further advised that the adapted procedures were "***for the duration of the emergency***."[2]

The COVID-19 emergency has not abated; to the contrary, COVID-19 cases are surging. Given these conditions, and in reliance on the March Guidance, numerous universities have already committed to online instruction for the fall, and students have also planned accordingly. Yet on July 6, Defendants abruptly shifted course: they announced that, if a school continues with online-only instruction for the fall semester, SEVP students "must leave the country or take alternate steps … such as transferring to a school with in-person instruction."[3]

Just one month ago, the Supreme Court warned that, when the Executive Branch changes course, it must "turn square corners" by considering all important aspects of the problem, including people's reliance on the prior policy. *Dep't of Homeland Security v. Regents of Univ. of Cal.*, 140 S. Ct. 1891, 1909, 1914 (2020) ("*Regents*"). Defendants again have failed to heed that requirement.

The July 6 policy change is unsupported by any reasoned explanation and is entirely arbitrary, whether viewed from the perspective of public health, the integrity

---

[1] Broadcast Message: Coronavirus Disease 2019 (COVID-19) and Potential Procedural Adaptations for F and M nonimmigrant students, No. 2003-01 (Mar. 9, 2020) (hereinafter "March 9 Guidance"), attached as Exhibit A to the Declaration of Sheri Porath Rockwell ("Rockwell Decl.").

[2] COVID-19: Guidance for SEVP Stakeholders, March 13, 2020 (emphasis added) (hereinafter the "March 13 Guidance," and together with the March 9 Guidance, the "March Guidance"), attached as Rockwell Decl. Ex. B.

[3] Broadcast Message: COVID-19 and Fall 2020, No. 2007-01 (July 6, 2020) (hereinafter "July 6 Guidance"), attached as Rockwell Decl. Ex. C.

of the student-visa program, or the March Guidance. It ignores the ongoing COVID-19 crisis and the on-the-ground expertise of university officials as to the safest course for their communities. It fails to consider the extraordinary impact on students and the significant reliance interests created by the March Guidance. The July 6 policy change makes sense *only* as a cruel pretext to use SEVP students as leverage "to encourage schools to reopen"—which is the explanation for the policy given to reporters by Acting Deputy Secretary of Homeland Security Ken Cuccinelli,[4] consistent with the President's July 6 tweet, "SCHOOLS MUST OPEN IN THE FALL!!!"[5]

Plaintiffs are SEVP students who are in law school or graduate programs in California and will be irreparably harmed by the policy change. If they are forced to leave the country, they will face exorbitant financial costs and health risks to return to places where continuing their studies will be impractical, if not impossible. Contrary to what Defendants glibly suggest, they cannot simply transfer to a different school just one month before the semester starts. Even if it were possible to attend classes in-person, Plaintiffs cannot do so without risking exposing themselves to the coronavirus and thus risking their health and the health of others.

Based on the foregoing, Plaintiffs now seek a temporary restraining order ("TRO") preventing Defendants from implementing the July 6 policy change. Plaintiffs are likely to succeed on the merits, as the policy change violates the Administrative Procedure Act ("APA") in multiple ways, and so arbitrarily impairs students' liberty and property interests as to violate due process. Plaintiffs have also shown irreparable harm and that the balance of hardships and public interest tip decisively in favor of a TRO to preserve the status quo. Accordingly, Plaintiffs respectfully request that their application be granted in full.

---

[4] *See* John Bowden, *Cuccinelli Says Rule Forcing International Students to Return Home Will 'Encourage Schools to Reopen*, The Hill (July 7, 2020), https://thehill.com/homenews/administration/506248-cuccinelli-says-rule-forcing-international-students-to-return-home. All websites were last visited July 14, 2020.

[5] Donald J. Trump (@realDonaldTrump), Twitter (July 6, 2020, 2:40 PM EDT), https://twitter.com/realDonaldTrump/status/1280209946085339136?s=20.

1

**BACKGROUND**

2

**A.     The F-1 Student Visa Program and Its Goal of Attracting**
3        **International Students to Study in the United States**

4        For decades, the United States has labeled students as "non-immigrants" and

5   operated a student-visa program. Section 101(a)(15)(F)(i) of the Immigration and

6   Nationality Act of 1952, as amended (INA), 8 U.S.C. 1101(a)(15)(F)(i), establishes

7   the current F-1 nonimmigrant classification for "bona fide student[s] qualified to

8   pursue a full course of study" at an academic institution certified by SEVP, which is a

9   subdivision of U.S. Immigration and Customs Enforcement ("ICE"), within the

10  Department of Homeland Security ("DHS"). *See also* 81 Fed. Reg. 13040, 13044-45

11  (Mar. 11, 2016) (providing background to statutory and regulatory history). The

12  current requirements for the F-1 student visa program, and the related ability to

13  engage in optional practical training ("OPT"), are set forth at 8 C.F.R. § 214.2(f).

14       The visa program exists not just for the benefit of the students but because of

15  "the substantial economic, scientific, technological, and cultural benefits provided by

16  the F-1 nonimmigrant program generally." 81 Fed. Reg. at 13047. "International

17  students have historically made significant contributions to the United States, both

18  through the payment of tuition and other expenditures in the U.S. economy, as well as

19  by significantly enhancing academic discourse and cultural exchange on campuses

20  throughout the United States." *Id.*; *see also* Richardson Decl. ¶¶ 18-20. For that

21  reason, the United States "promotes U.S. higher education to students around the

22  world," including through programs such as the State Department's EducationUSA,

23  which sets up "advising centers" around the world to persuade students to choose to

24  come to this country and assist qualified candidates in accessing U.S. higher education

25  opportunities.[6]

26       According to studies cited by DHS, as of 2013, nearly 900,000 international

27
_____
28  [6] *See* U.S. Dep't of State, EducationUSA, https://educationusa.state.gov/about-educationusa, https://educationusa.state.gov/educationusa-advising-centers.

students were affiliated with U.S. colleges and universities, and they contributed $26.8 billion to the U.S. economy in the form of tuition, housing payments, and living expenses for themselves and family. 81 Fed. Reg. at 13047-48. The numbers have only grown since then, with over 1,090,000 international students attending higher education institutions in 2018 and collectively contributing $44.7 billion to the U.S. economy.[7] In 2018, California hosted more than 300,000 nonimmigrant students, more than any other state.[8]

### B. The COVID-19 Crisis, and SEVP's Initial, Appropriate Response

In early March 2020, the world began to acknowledge the onset pf  what we know today is a global COVID-19 pandemic. Mishori Decl. ¶ 7. California's institutions quickly responded. Both symptomatic and asymptomatic individuals contribute to the spread of the novel coronavirus, the virus that causes COVID-19 disease, through respiration (e.g., coughing, sneezing, or talking) and by touching and thereby contaminating surfaces. *Id.* ¶ 8. The primary interventions to stop the spread of coronavirus are (1) social distancing, (2) engaging in optimal hygiene practices, and (3) quarantining. *Id.* ¶ 25.

In response to the growing crisis, on March 4, 2020, Governor Gavin Newsom declared a state of emergency.[9] Within a week, on March 9, universities began suspending in-person instruction, including schools in the University of California ("UC") system and the University of Southern California ("USC").[10] As the threat progressed, on March 19, Governor Newsom announced a statewide stay-at-home

---

[7] *See* https://www.iie.org/Why-IIE/Announcements/2019/11/Number-of-International-Students-in-the-United-States-Hits-All-Time-High.

[8] https://www.ice.gov/doclib/sevis/pdf/sevisByTheNumbers2018.pdf.

[9] https://www.gov.ca.gov/wp-content/uploads/2020/03/3.4.20-Coronavirus-SOE-Proclamation.pdf.

[10] *See* Richardson Decl. ¶ 5 (UCI); *see also* https://news.berkeley.edu/2020/03/09/as-coronavirus-spreads-uc-berkeley-suspends-in-person-instruction/; https://covid-19.ucla.edu/transitioning-ucla-to-online-instruction; https://coronavirus.usc.edu/2020/03/10/update-to-university-policies-and-plans.

1  order that, among other things, confirmed that universities could not continue

2  operating in-person classes.[11]

3  　　　Consistent with these unprecedented developments, on March 9, SEVP issued a

4  Broadcast Message—the March 9 Guidance. Rockwell Decl. Ex. A. The purpose of

5  the March 9 Guidance was to address the requirement that visa students maintain a

6  "full course of study," which by regulation generally precludes F-1 students from

7  taking more than one class "on-line or through distance education and does not require

8  the student's physical attendance for classes." 8 C.F.R. 212.4(f)(6)(i)(G). The March 9

9  Guidance recognized that "SEVP-certified schools may need to adapt their procedures

10  and policies to address the significant public health concerns associated with the

11  COVID-19 crisis." Rockwell Decl. Ex. A, at 1. It assured schools and students that

12  "SEVP is focused on ensuring that nonimmigrant students are able to continue to

13  make normal progress in a full course of study as required by federal regulations," and

14  that "SEVP intends to be flexible with temporary adaptations." *Id.* at 1.

15  　　　On March 13, President Trump declared a COVID-19 national emergency.[12]

16  On that same date, SEVP issued additional guidance (the March 13 Guidance) to

17  address inquiries it had received concerning the "different scenarios" a school or

18  student might face as the pandemic played out. Rockwell Decl. Ex. B at 1. In

19  particular, SEVP assured stakeholders that, if a school closes temporarily but offers

20  online instruction, SEVP will allow F-1 students to "count online classes towards a

21  full course of study," notwithstanding the limits in 8 CFR 214.2(f)(6)(i)(G). *Id.* The

22  March 13 Guidance cautioned that this accommodation was "temporary" in that it was

23  intended to be only in effect "for the duration of the emergency," and could change as

24  SEVP continued "to monitor the COVID-19 situation." *Id.* at 1-2.

25

26  [11] See Executive Order N-33-20, Executive Dep't State of California (March 19, 2020).

27  [12] https://www.whitehouse.gov/presidential-actions/proclamation-declaring-national-

28  emergency-concerning-novel-coronavirus-disease-covid-19-outbreak/.

**C.**     **The COVID-19 Emergency Continues, Yet Defendants Abruptly Change Course to Require In-Person Instruction**

While the spring semester has concluded, the COVID-19 emergency has not. Mishori Decl. ¶ 40. Summer did not cause the virus to disappear, and the President has not withdrawn the national emergency declaration. To the contrary, in California and elsewhere, COVID-19 infection and death rates remain consistent with—and indeed are exceeding—the levels when the March Guidance was issued. *Id.* ¶¶ 20-22. Schools have seen an increase in positive cases among students and faculty since June. Richardson Decl. ¶ 16.

Given these conditions and in reliance on the March Guidance, schools in California and across the country expended significant time and expense to assess and craft plans for the Fall 2020 academic year aimed at protecting the health and safety of the students, faculty and staff, while allowing students to attend classes. *See, e.g.*, Richardson Decl. ¶¶ 15, 6-14, 22. After careful consideration, schools adopted various education programs, which include online-only class schedules for some or all students. *Id.* ¶¶ 13-14.

The ongoing effects of the COVID-19 crisis are, unfortunately, not surprising. Even members of the State Department had recognized the possibility that "the fall semester on U.S. campuses is largely conducted online," yet continued "to encourage international students to choose U.S. institutions," because "U.S. higher education's academic quality, rigor and values, including critical thinking and academic freedom, will be fully maintained through its virtual offerings as well."[13]

Notwithstanding the ongoing crisis, on July 6, 2020, Defendants abruptly reversed course and effectively rescinded the March Guidance. In the opening paragraph of the July 6 announcement, SEVP stated as follows:

---

[13] Statement of Caroline Casagrande, Bureau of Educ. & Cultural Affairs, U.S. Dept. of State, Apr. 22, 2020, https://educationusa.state.gov/us-higher-education-professionals/eca-das-casagrande-statement-academic-exchanges-and-covid19.

13

> Temporary procedural adaptations related to online courses permitted by the Student and Exchange Visitor Program (SEVP) during the height of the Coronavirus Disease (COVID-19) crisis will be modified for the fall 2020 semester. There will still be accommodations to provide flexibility to schools and nonimmigrant students, but as many institutions across the country reopen, there is a concordant need to resume the carefully balanced protections implemented by federal regulations.

Rockwell Decl., Ex. C. at 1[14] With that preface, SEVP announced that it "is modifying the temporary exemptions" announced in March. Under the new policy, nonimmigrant students "attending schools operating entirely online [for the fall] may not take a full online course load and remain in the United States." *Id.* Instead, they "must depart the country or take other measures, such as transferring to a school with in-person instruction to remain in lawful status. If not, they may face immigration consequences including, but not limited to, the initiation of removal proceeding." *Id.* The Guidance further states that, if a school begins the semester with in-person instruction, but then switches to online-only instruction, students "must leave the country or take alternative steps to maintain their nonimmigrant status." *Id.* at 2.

Reflecting that the July 6 Guidance would have immediate effect, SEVP stated that schools are required to notify SEVP *by July 15, 2020* if they intend to only offer remote instruction. *Id.* (emphasis added). The Guidance also imposes on schools the nearly impossible burden of issuing, by August 4, new "Form I-20" certifications for "each" of their international students, confirming that each student is not taking an entirely online course load for the fall. *Id.* at 2; *see also* Richardson Decl. ¶ 26.

Also on July 6, at 2:40 p.m. Eastern Time, President Donald Trump tweeted his support for the opening of schools by stating, "SCHOOLS MUST OPEN IN THE

---

[14] The paragraph continued by stating that DHS "publish the procedures and responsibilities … in the near future as a Temporary Final Rule in the Federal Register. This message is intended to provide additional time to facilitate the implementation of these procedures." *Id.*

FALL!!!"[15] The next day, Acting DHS Secretary Ken Cuccinelli, in response to questions from reporters about the policy change, confirmed his view that, if a university is not holding in-person classes, then "[t]here isn't a reason for a person holding a student visa to be present in the country;" he further acknowledged the real purpose behind the policy, explaining that the agency was setting the rules to "encourage schools to reopen." *Id.*

Also on July 7, in an apparent response to the uproar over the policy change, Defendants issued an FAQ purporting to provide a different rationale. It claimed, among other things, the policy was designed to "maximize flexibility for students to continue their studies, while minimizing the risk of transmission of COVID-19 by not admitting students into the country who do not need to be present to attend classes in-person." Rockwell Decl. Ex. D.

### D.     Plaintiffs Are International Students Who Will Be Irreparably Harmed by the Policy Change

Plaintiffs are international students currently enrolled in graduate degree programs, including law schools, at prominent universities in southern California on F-1 student visas. Z.L. Decl. ¶ 1; Z.W. Decl. ¶ 1; W.R. Decl. ¶ 1; M.X. Decl. ¶ 1; C.Y. Decl. ¶ 1; A.G. Decl. ¶ 1; X.Y. Decl. ¶ 1. Most have completed their first or second years in law school, and one Plaintiff is nearing the completion of a years-long PhD program in film studies. *See id.* Plaintiffs attend schools that are exclusively offering online education in the fall either to all students or to students similarly situated to Plaintiffs. A.G. Decl. ¶ 9; Richardson Decl. ¶ 13.

Transfer is not a realistic option. For Plaintiffs attending law school, it is not feasible to transfer to a different school because, for example, the transfer deadline either had already passed prior to July 6 or is so imminent that students would have no time to assemble the materials for their application. Zearfoss Decl. ¶¶ 4-7. Moreover,

---

[15] Donald J. Trump (@realDonaldTrump), Twitter (July 6, 2020, 2:40 PM); *see also* Donald J. Trump (@realDonaldTrump), Twitter (July 10, 2020, 7:41 AM).

if a university transitions to online-only instruction mid-semester due to changing COVID-19 conditions, a mid-semester transfer would be impossible. Further, law schools and other postgraduate programs are not fungible, as they often serve specific markets or have other specializations. *Id.* ¶ 8.

Thus, under the July 6 Guidance, Plaintiffs will be forced to leave the United States and be ripped from their communities and their academics. Their carefully-laid financial, health, employment, immigration, and personal plans will be upended. For example:

*Housing.* By July 6, several Plaintiffs had already entered into leases and secured housing in reliance on their ability to be present in the United States during the fall term, regardless of how their schools decided to hold class. X.Y. Decl. ¶¶ 4, 11; C.Y. Decl. ¶ 6; Z.W. Decl. ¶ 6; A.G. ¶ 4; M.X. Decl. ¶ 4; Z.W. Decl. ¶¶ 4, 6; C.Y. Decl. ¶ 6. If forced to leave the country, they will suffer financial losses from having to break their leases and lose security deposits, or otherwise continue to pay rent until the lease terminates. *See id.* They would also have to incur expensive moving and storage costs. Z.L. Decl. ¶ 8. If their schools reopen again during this coming academic year, they will incur additional moving costs, assuming they are even able to find housing on short notice.

*Travel.* Multiple countries have shut their borders and banned all transnational flights due to the pandemic; others have specifically barred flights from the United States.[16] As airline passengers, Plaintiffs would spend hours in a confined space surrounded by shared surfaces—exactly the kind of prolonged exposure that creates substantial risk of contracting the novel coronavirus. Mishori Decl. ¶ 36; W.R. Decl. ¶ 4. Further, travel to Plaintiffs' home countries has become exorbitantly, and for some prohibitively, expensive. X.Y. Decl. ¶ 6; M.X. Decl. ¶ 6; W.R. Decl. ¶ 4; C.Y.

---

[16] See United States Department of State, Global Level 4 Health Advisory – Do Not Travel (March 31, 2020), https://travel.state.gov/content/travel/en/traveladvisories/ea/travel-advisory-alert-global-level-4-health-advisory-issue.html.

Decl. ¶¶ 7, 14. In addition, for students returning to countries, such as China, that have imposed a quarantine on incoming travelers, the students would have to pay for 14 days' lodging while they quarantine. M.X. Decl. ¶ 6; W.R. Decl. ¶ 4; Z.W. Decl. ¶ 6; C.Y. Decl. ¶ 8. If their schools reopen during the academic year, the Plaintiffs would have to incur travel costs and expose themselves to the risk of travel all over again.

*Health Risks.* In addition to the increased risk of exposure to the novel coronavirus during transit, Z.W. Decl. ¶ 7, C.Y. Decl. ¶ 9, Plaintiffs also would need to maintain unhealthy irregular sleep schedules if they are forced to take classes and attempt to participate in extracurricular activities remotely from their home countries. Z.L. Decl. ¶ 5. Further, certain Plaintiffs have already paid for their 2020–2021 health insurance plans through their universities—plans that will do nothing for them in their country of origin. X.Y. Decl. ¶ 5; A.G. Decl. ¶ 11. Several Plaintiffs would also subject their older family members to greater risk by returning home to live with them. A.G. Decl. ¶¶ 11-12; Z.L. Decl. ¶ 4; Mishori Decl. ¶ 37.

*Education Inequities.* Students in different time zones, some with a 16-hour difference, will be forced to choose between attending online classes in the middle of the night or watching recorded classes. A.G. Decl. ¶ 13; Z.L. Decl. ¶ 5; C.Y. Decl. ¶ 10; Z.W. Decl. ¶ 8; Richardson Decl. ¶¶ 23, 24. Those who attempt to participate in live classes will be required to stay alert for two to three hours of lectures occurring in the middle of the night in their time zones. Those who opt to watch recordings will be harmed because they will not be able to ask questions during class, participate in class discussions, or otherwise have a visible presence. Richardson Decl. ¶ 23; Z.L. Decl. ¶ 5. Either way, students will be put at a substantial disadvantage compared to their classmates who are able to take the same classes during their normal waking hours. Richardson Decl. ¶ 23; Z.L. Decl. ¶ 5; A.G. Decl. ¶ 13.

Further, forcing Plaintiffs to return to their countries of origin will severely limit their practical learning opportunities. In law school clinical programs, meeting and communicating with clients, supervisors, and team members constitute a

1    meaningful part of the educational experience. W.R. Decl. ¶ 5; Richardson Decl. ¶ 24.

2    Both clinic and pro bono opportunities would be impacted, further disadvantaging

3    Plaintiffs, as some law schools confer graduation honors based on the number of pro

4    bono hours completed. Richardson Decl. ¶ 24; C.Y. Decl. ¶ 10.

5            For some Plaintiffs, participating in online classes in their countries of origin

6    may not be an option at all. Internet access, which is absolutely necessary for remote

7    learning, is not guaranteed in all of their countries. Z.L. Decl. ¶ 5. Some countries

8    have restricted internet access while others block it altogether. W.R. Decl. ¶ 5; M.X.

9    Decl. ¶ 7; Z.W. Decl. ¶ 8; C.Y. Decl. ¶ 10. Others heavily monitor internet activity

10    and curtail or limit access to needed resources. W.R. Decl. ¶ 5; M.X. Decl. ¶ 7; Z.W.

11    Decl. ¶ 8; C.Y. Decl. ¶ 10; Z.L. Decl. ¶ 5. Many schools, including UC Irvine, use

12    Google products like Gmail and Google Drive to communicate and collaborate on

13    academic and clinical, access to which is limited in China. W.R. Decl. ¶ 5; M.X. Decl.

14    ¶ 7; Z.W. Decl. ¶ 8; C.Y. Decl. ¶ 10. In addition, some students fear being exposed to

15    government harassment based on the contents of their studies. Z.L. Decl. ¶ 9. These

16    restrictions and impediments will make it difficult, if not impossible, for many

17    Plaintiffs to continue their studies abroad.

18            *Inequities in Employment and Training Opportunities.* The July 6 Guidance

19    also will effectively prevent Plaintiffs who are in law school from physically attending

20    on campus interviews for summer employment. C.Y. Decl. ¶ 12. If schools decide to

21    hold virtual on campus interview, Plaintiffs will have to interview in the middle of the

22    night and compete against domestic students who are interviewing during normal

23    business hours. *Id.* Many of the Plaintiffs had planned to apply for jobs or work

24    programs following graduation. X.Y. Decl. ¶¶ 8-9; M.X. Decl. ¶ 5; Z.W. Decl. ¶ 5.

25    The July 6 Guidance will effective prevent Plaintiffs whose schools will operate

26    entirely online from applying for Curricular Practical Training ("CPT") and Optional

27    Practical Training ("OPT") visa programs, both of which require students to be

28    physically present in the United States at the time of application.

*Personal Costs*. Plaintiffs have made major life decisions in reliance on staying in the United States while in school. If forced to leave, four Plaintiffs would be separated from their spouse or partner. W.R. Decl. ¶ 3; M.X. Decl. ¶¶ 3, 10; Z.L. ¶ 11; X.Y. Decl. ¶ 10. One Plaintiff chose to attend USC in order to serve as the sole familial caretaker for her elderly great aunt who lives in Los Angeles, and who would be without a family member to care for her if she is forced to leave the country. A.G. Decl. ¶¶ 5, 11. Another fears returning home at this time, including because she may not be welcomed at her parents' home and has no idea where she might live if not permitted to stay in the U.S. Z.L Decl. ¶¶ 8-9. Another Plaintiff is concerned about abandoning the meaningful friendships she has developed with her classmates, professors and lawyers in the area. C.Y. Decl. ¶ 13.

In general, since the July 6 Guidance, Plaintiffs have suffered severe anxiety and stress, their plans for the fast-approaching academic year now in disarray. A.G. Decl. ¶ 8; W.R. Decl. ¶ 8; Z.L. Decl. ¶¶ 10, 12; C.Y. Decl. ¶¶ 13-14. As Plaintiff W.R. says, "ICE's revised policy is treating international students with cruelty, and it threatens to separate families like mine in the middle of this incredibly challenging moment for everyone around the world." W.R. Decl. ¶ 8.

## LEGAL STANDARD

Motions for temporary restraining orders are governed by the same four-factor test as preliminary injunctions: Courts consider whether petitioners have shown: (1) a likelihood of success on the merits, (2) that they are likely to suffer irreparable harm in the absence of such relief, (3) that the balance of equities tips in their favor, and (4) that an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *Hernandez v. Sessions*, 872 F.3d 976, 989-90 (9th Cir. 2017).

Under the Ninth Circuit's "sliding scale" approach, "a stronger showing of one element may offset a weaker showing of another." *Hernandez*, 872 F.3d at 989-90 (quoting *Pimentel v. Dreyfus*, 670 F.3d 1096, 1105 (9th Cir. 2012) (per curiam)). For

example, injunctive relief is warranted when an applicant raises "serious questions going to the merits," if the balance of hardships "tips sharply towards" granting an injunction in light of the danger of irreparable harm and after weighing the public interest. *Disney Enters., Inc. v. VidAngel, Inc.*, 869 F.3d 848, 856 (9th Cir. 2017) (quoting *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134-35 (9th Cir. 2011)).

## ARGUMENT

## I.   PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS

As set forth in Plaintiffs' Complaint and below, the July 6 Guidance violates the Administrative Procedure Act ("APA"), 5 U.S.C. § 706, because it is arbitrary and capricious in failing to consider the reliance interests of student visa holders and failing to provide a reasoned explanation for the change in policy, notwithstanding the fact that the COVID-19 crisis is continuing and, indeed, surging. The July 6 Guidance was also issued without meeting notice-and-comment requirements for actions affecting substantial rights and is so arbitrarily imposed as to violate due process.

### A.   The July 6 Policy Change Is Arbitrary and Capricious, in Violation of the APA.

The APA provides a mechanism for courts to review final agency action, 5 U.S.C. § 702, and it directs courts "[to] hold unlawful and set aside" actions that are "arbitrary" or "capricious," 5 U.S.C. § 706(2)(A). *See Regents*, 140 S. Ct. at 1905. At its core, the APA requires agencies "to engage in 'reasoned decisionmaking.'" *Id.* (citation omitted). Agency action will be found arbitrary and capricious where the agency has "'failed to consider an important aspect of the problem.'" *Id.* at 1910 (quoting *Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)); *see also Amerijet Int'l, Inc. v. Pistole*, 753 F.3d 1343, 1350 (D.C. Cir. 2014) (explaining that it is "a fundamental requirement of administrative law … that an agency set forth its reasons for decision[s]; an agency's failure to do so constitutes arbitrary and capricious agency action") (citation omitted).

Here, the July 6 policy change qualifies as final agency action under the APA.

It announces a definitive decision that SEVP procedures and responsibilities "*will* be modified for the fall 2020 semester" through publication of a Temporary Rule, and it *immediately* alters students' and schools' obligations by telling them what they "must" do under the new rule. Rockwell Decl. Ex. C, at 1. For schools, the July 6 Guidance directs that they "***must*** complete an operational change plan … no later than Wednesday, July 15, 2020." *Id.* at 2 (emphasis in original). For students, it instructs that, if their program will be online only, then they "must depart the country or take other measures … or potentially face immigration consequences including, but not limited to, the initiation of removal proceedings." *Id.* at 1. In these respects, the July 6 Guidance squarely satisfies the conditions for finality, as it cannot be considered "merely tentative or interlocutory," and it is clearly intended to trigger changes in schools' and students' conduct and obligations, as well as the legal consequences that flow from them. *Bennett* v. *Spear*, 520 U.S. 154, 177-178 (1997); *see also U.S. Army Corps of Engineers* v. *Hawkes Co., Inc.*, 136 S. Ct. 1807, 1810 (2016).

As explained below, Defendants' action should be set aside as arbitrary and capricious, as it is devoid of reasoned decisionmaking and fails to consider important aspects of the problems.

### 1.  Defendants Failed to Adequately Consider the Reliance Interests of Student Visa Holders.

In *Regents*, the Supreme Court explained that when an agency changes policy in a way that affects substantial interests, it must "turn square corners." 140 S. Ct. at 1909 (internal quotation omitted). That includes considering "whether there was 'legitimate reliance'" on the prior policy, even if the prior policy was merely an exception to the enforcement of the law as written and did not purport to provide any permanent rights. *Id.* at 1913. In other words, when an agency is "not writing on a blank slate," it is "*required* to assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns." *Id.* at 1915 (emphasis added). The failure to do so, by itself, renders an

1    action arbitrary and capricious. *Id.* at 1913-15; *see also Encino Motorcars, LLC v.*

2    *Navarro*, 136 S. Ct. 2117, 2126 (2016).

3        Here, when SEVP announced the March 9 Guidance, it did so out of

4    recognition that "SEVP-certified schools may need to adapt their procedures and

5    policies to address the significant public health concerns associated with the COVID-

6    19 crisis." Rockwell Ex. A, at 1. And it assured students and schools that "SEVP

7    intends to be flexible with temporary adaptations." *Id.* Then, in the March 13

8    Guidance—when President Trump declared a national emergency—SEVP specifically

9    advised that, if schools transitioned to online only instruction, students could still

10   count those online courses toward their "full course of study." Rockwell Ex. B, at 1.

11       To be sure, the March Guidance reflected that the accommodations for online

12   instruction were "temporary," in that they were intended to be "only in effect *for the*

13   *duration of the emergency.*" *Id.* (emphasis added). Similarly, SEVP advised that the

14   guidance "may be subject to change" due to "the fluid nature of this difficult

15   situation," and that "SEVP will continue to monitor the COVID-19 situation and will

16   adjust its guidance as needed." But the plain meaning of those caveats is that any

17   changes in policy would be *based on changes in the COVID-19 situation*. Nothing

18   suggested that Defendants would rescind the policy *while the emergency was still*

19   *ongoing*, even though students and schools are still facing "the significant public

20   health concerns" that motivated the initial policy.

21       Schools acted in reliance on the March Guidance when, facing ongoing health

22   risks, they made the difficult decision to continue with virtual instruction during the

23   fall semester. Richardson Decl. ¶ 15. And students, including Plaintiffs, acted in

24   reliance on the March Guidance in committing to housing and planning for the fall

25   semester, believing that they would be able to continue living and studying in the

26   United States, even if the continuing spread of the coronavirus required virtual

27   programming. A.G. Decl. ¶ 16; C.Y. Decl. ¶ 6; M.X. Decl. ¶ 4; X.Y. Decl. ¶ 4; Z.W.

28   Decl. ¶ 4. *See* Background Part D, *supra*.

Yet Defendants took none of this into account in issuing the July 6 Guidance. It is undisputed that the President's emergency proclamation remains in effect, and the July 6 Guidance does not suggest that the public health crisis has materially lessened, such that schools and students should have expected a policy change. Defendants also nowhere accounted for the fact that, by July 6, many schools *had already committed* to online instruction for the fall. Nor did Defendants consider the fact that students had already committed to their fall program and, with barely a month before the start of classes, likely would have no ability to transfer to a comparable program.

If Defendants had determined upfront that in-person learning would be required in the fall, regardless of the COVID-19 situation, they could have said so. But having given students assurances that the March Guidance would be in effect for "the duration of the emergency," Defendants were not writing on blank slate and could not change the policy without at least considering students' legitimate reliance interests. Defendants' failure to do so, by itself, renders the policy change arbitrary and capricious and therefore void.

### 2.    Defendants Failed to Provide a Reasoned Explanation.

Even if one puts the reliance interests aside, the July 6 Guidance is still unsupported by any adequate, reasoned explanation and manifestly failed to consider important aspects of the problem. Indeed, to the extent Defendants have provided an explanation, it is patently insufficient and likely pretextual.

1. At the outset, the July 6 Guidance is devoid of any reasoned explanation at all. At less than three pages long, the July 6 Guidance is replete with directions on what schools and students "must" do, but it absolutely no discussion – none at all – of any factors that Defendants considered.

The closest the July 6 Guidance comes to providing a policy explanation is the opaque assertion that there is a "need to resume the carefully balanced protections implemented by federal regulations." Rockwell Decl. Ex. C. But this is merely

1   conclusory: it fails even to articulate what the "need" is or what those "carefully

2   balanced protections" are, let alone to explain what the "need" is now "to resume"

3   them. *Id.* Presumably, the latter statement is referring to the regulations' definition of

4   a "full course of study" as involving mostly in-person classes, 8 C.F.R. §

5   214.2(f)(6)(i)(G)—a requirement that ensures that visa student have a bona fide reason

6   for being in the United States and are not using enrollment in pay-to-attend online

7   courses as an excuse to immigrate here. Those concerns are entirely inapplicable to

8   Plaintiffs and other SEVP students who came to this country to attend competitive and

9   well-established universities, and who would be committed to a full course of in-

10  person study but for the unprecedented conditions created by the novel coronavirus.

11    Meanwhile, the July 7 FAQ provides a different, but equally deficient, rationale

12  for the shift in guidance. The July 7 FAQ did not refer to the "carefully balanced

13  protections" of federal regulations, but instead suggested that the policy was

14  implemented "to maximize flexibility for students to continue their studies, while

15  minimizing the risk of the risk of transmission of COVID-19 by not admitting

16  students into the country who do not need to be present to attend classes in-person."

17  Rockwell Decl. Ex. D, at 3.

18    That makes no sense. First, this "explanation" does not account for the fact that

19  the policy change impacts students *already in the United States*. As to this group, the

20  July Guidance pressures students to attend in-person classes, *which would increase*

21  *the risk of transmission*—precisely the *opposite* objective the new Guidance purports

22  to achieve with respect to students currently overseas. Second, even as to students

23  currently overseas, the July 6 Guidance specifically invites them to return to the U.S.

24  by transferring to other schools providing in-class instruction. Thus, even as to that

25  group, the policy is not rationally designed to limit the transmission of COVID-19.

26    Thus, if anything, the July 7 FAQ only confirms the lack of reasoned

27  decisionmaking, as it is neither consistent with the reasons given in the July 6

28  Guidance, nor is it internally coherent or rationally related to the policy change.

2. The lack of a reasoned explanation for the July 6 policy change alone establishes that it is arbitrary and capricious under the APA. *Regents*, 140 S. Ct. at 1915. But the July 6 Guidance is independently arbitrary and capricious because it is devoid of evidence that Defendants "pa[id] attention to the advantages *and* the disadvantages of [their] decisions." *Michigan v. EPA*, 135 S. Ct. 2699, 2707 (2015).

First, nothing in the Guidance purports to consider current COVID-19 conditions, or their ongoing impact on the health and safety of students. Indeed, the words "health" and "safety" *do not even appear in the July 6 Guidance.* Obviously, students will be at higher risk of contracting COVID-19 if they are forced to attend in-person instruction. Mishori Decl. ¶¶ 25-35. Nor do Defendants acknowledge that many students will have pre-existing conditions, or live with people with pre-existing conditions, thus making in-person attendance particularly dangerous for them.

Second, while the July 6 Guidance asserts that "many institutions across the country are reopen[ing]," Rockwell Ex. C, it ignores that in many other areas, the COVID-19 crisis is worsening and may lead to further lockdowns. Even if certain institutions are re-opening, Defendants nowhere consider that the safety and advisability of reopening any given school will depend on numerous school-specific factors. Those include, for example, local COVID-19 spread, testing capabilities, the particular school's facilities and typical class sizes, whether a significant number of students must rely on public transit to attend class, and whether in-person capabilities should be prioritized for certain portions of the student body (such as at UCI Law School, where the school committed to providing in-person instruction for first-year law students, even as it decided to go online only for second- and third-year students). For these reasons, the on-the-ground school administrators are best positioned to determine what is safe, feasible and most academically appropriate, for their given student body. But Defendants did not consider *any* of these school-specific factors, or how their policy change would disrupt the academic preparation for the upcoming semester. *See* Richardson Decl. ¶¶ 6-14, 17.

Third, the July 6 Guidance does not take into account the extreme hardship and disruption imposed on the students. International students such as Plaintiffs came to the United States based on their strong academic qualifications. They obtained admission to competitive universities and worked diligently toward their degrees as part of a student-visa program that exists not just for their benefit, but the benefit of their academic institutions and the country as whole. *See* Richardson Decl. ¶¶ 18-20. If students are forced to leave the country, they will suffer extreme financial cost and will put their health at risk, and many students simply will not be able to continue their education while abroad. *See supra* at Background Part D; see also Part II, *infra*. While the July 6 Guidance also implies that students could simply transfer to a school with in-person instruction, Rockwell Ex. C, that clearly is not true for Plaintiffs and many other students. *See generally* Zearfoss Decl.; *see also* Z.W. Decl. ¶ 9; Z.L. Decl. ¶ 11; C.Y. Decl. ¶ 13; M.X. Decl. ¶ 8; A.G. Decl. ¶ 14; X.Y. Decl. ¶ 10. It is not only arbitrary and capricious but unconscionable for Defendants to disregard the ways in which the policy change jeopardizes the students' health and educational interests—and indeed throws their entirely lives into disarray—based on circumstances beyond the students' control.

3. While it is unnecessary to go any further in the analysis, there are other bases for concluding that any purported justifications given for the July 6 Guidance are purely pretextual. As the Supreme Court has recently explained, "in order to permit meaningful judicial review, an agency must 'disclose the basis' of its action." *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2573 (2019). "The reasoned explanation requirement of administrative law, after all, is meant to ensure that agencies offer genuine justifications for important decisions, reasons that can be scrutinized by courts and the interested public. Accepting contrived reasons would defeat the purpose of the enterprise." *Id.* at 2575-76. Thus, agency action will violate the APA if there is "a significant mismatch" between the actual reasons for agency action and the rationale provided.

Given the absence of any explanation within the July 6 Guidance for the abrupt policy change, the true motivation lies in the contemporaneous public statements of Ken Cuccinelli, Acting Secretary of DHS, as well as the President himself. Mr. Cuccinelli admitted that the policy change was made "to encourage schools to reopen," *Bowden*, *supra* n. 4. In other words, by threatening international students *with removal proceedings*, he could strong arm universities into reopening their campuses in conformance with the President's agenda. While politicized influence is not alone a reason to set aside agency action, courts can and should reject agency action that treats innocents as political pawns and puts both their health and educational interests at risk, simply to serve an ulterior motive.

For these reasons, the July 6 Guidance effects a policy change that is arbitrary and capricious. Defendants thus are likely to prevail on the merits, and the Court should issue the TRO.

### B.   The July 6 Policy Change Violates the APA's Notice-and-Comment Procedures.

The policy change violates the APA for a separate and independent reason. When an agency is promulgating a new substantive rule, it must follow notice-and-comment ruling procedures. 5 U.S.C. §§ 551(4), 553. That includes (1) publication of notice of the proposed rule in the Federal Register; (2) a period for interested individuals to comment on the proposed rule; and (3) publication of the adopted rule not less than thirty days before its effective date." 5 U.S.C. § 553(b), (c), (d) (2006); *Mora-Meraz v. Thomas*, 601 F.3d 933, 939 (9th Cir. 2010). If a new substantive rule is promulgated "without observance of procedure required by law," then it must be set aside. 5 U.S.C. § 706(2)(D).

The July 6 policy change violates these requirements. It reflects a new substantive rule because it redefines what students must do "to maintain their F-1 and M-1 nonimmigrant status during the COVID-19 emergency"—i.e., they must appear for in-person instruction "to remain in lawful status" or else "face immigration

consequences including, but not limited to, the initiation of removal proceedings." Rockwell Decl. Ex. C, at 1. The policy change therefore "impose[s] obligations, or effect[s] a change in existing law pursuant to authority delegated by Congress." *Hemp Indus. Ass'n v. Drug Enforcement Admin.*, 333 F.3d 1082, 1087 (9th Cir. 2003); *see also Mada-Luna v. Fitzpatrick*, 813 F.2d 1006, 1014 (9th Cir. 1987).

In announcing the July 6 policy change, Defendants indicated that a "Temporary Final Rule" would soon be published in the Federal Register, further confirming Defendants' intent to engage in rulemaking changing the SEVP "procedures and responsibilities" during the COVID-19 crisis. Notably, however, there is no suggestion that Defendants intend to engage in any notice-and-comment period. To the contrary, and as noted above, the July 6 Guidance is clear that Defendants expect schools and students to comply with new rules *now*, with students otherwise being subject to removal proceedings.

Had Defendants complied with the APA's require procedures, they would have received comments from schools and students alike, reflecting how ill-conceived, unfair, and harmful the policy change is. Regardless, the procedural violation itself requires the Court to set the policy change aside. *See Cedars-Sinai Med. Ctr. v. Shalala*, 939 F. Supp. 1457 (C.D. Cal. 1996) (citing *Linoz v. Heckler*, 800 F.2d 871, 878 (9th Cir. 1986)); 5 U.S.C. § 706(2)(D). Accordingly, Defendants have shown a likelihood of success on this issue as well.

### C.     The July 6 Guidance Violates Due Process

Even apart from if the APA violation, the July 6 Guidance imposes an arbitrary and irrational deprivation of Plaintiffs' constitutionally protected liberty and property interest, in violation of the Due Process Clause.

"[T]he touchstone of due process is protection of the individual against arbitrary action of government, whether the fault lies in a denial of fundamental procedural fairness, or in the exercise of power without any reasonable justification in the service

28

1   of a legitimate governmental objective." *Cty. of Sacramento v. Lewis*, 523 U.S. 833,

2   845-46 (1998) (citations omitted). The Due Process Clause forbids the deprivation of

3   "life, liberty, or property, without the due process of law," and applies to all 'persons'

4   within the United States, including noncitizens like Plaintiffs who are in the country.

5   U.S. Constitution, Art. V; *see Zadvyadas v. Davis*, 533 U.S. 678, 693 (2001) ("[T]he

6   Due Process Clause applies to all 'persons' within the United States ... whether their

7   presence here is lawful, unlawful, temporary, or permanent.").

8       Here, Plaintiffs have complied with the rigorous SEVP requirements and have

9   secured admission to highly competitive institutions while investing time, money, and

10  energy into pursuing their degrees in this county. They have a cognizable liberty

11  interest in not being arbitrarily subject to removal proceedings. *See Chew v. Colding*,

12  344 U.S. 590 (1953). And they have a cognizable property interest in their visas and

13  being able to continue the educational endeavors in which they have invested so

14  heavily, in reliance on the integrity of the student-visa program and their ability to

15  remain in the United States so as long as they remain committed to pursuing the full

16  course of study offered by their SEVP-certified institutions. *See Board of Regents of

17  State Colleges v. Roth*, 408 U.S. 564, 577 (1972) (it is the purpose of the institution of

18  "property" to "protect those claims upon which people rely in their daily lives,

19  reliance that must not be arbitrarily undermined.").

20      For all of the reasons explained above, the July 6 Guidance is so arbitrary and

21  irrational as to violate due process's protection of these constitutional interests. The

22  July 6 Guidance is not rationally related to mitigating the spread of the coronavirus,

23  because forcing students to attend in-person instruction will only increase the

24  likelihood of transmission. Nor can the July 6 Guidance be justified as responding to

25  changing conditions, because it was imposed notwithstanding the fact that the public

26  health emergency continues. Finally, the date it was issued—after schools and

27  students had already committed to their fall programs, and with no meaningful

28  opportunity to make alternative arrangements—confirms the arbitrariness of

29

Defendants' actions, all in total disregard for Plaintiffs' substantial and constitutionally protected interests. While courts use counsel and restraint when considering substantive due process claims, "history does not counsel abandonment" of all such claims particularly when, as here, government policies are so obviously arbitrary and serve no rational governmental interest.  See Moore v. City of East Cleveland Ohio, 431 U.S. 494, 502 (1977). Accordingly, Plaintiffs have established a likelihood of success on this claim as well.

## II.  PLAINTIFFS WILL SUFFER IRREPARABLE HARM ABSENT EMERGENCY RELIEF.

Plaintiffs will suffer irreparable harm if the July 6 Guidance is allowed to stand.

There is no safe or realistic option for Plaintiffs to stay in the country to complete their studies. Transferring to a school offering in person classes is not a realistic possibility at this late stage, with deadlines fast approaching and with schools already struggling to implement social distancing and online learning plans that will protect the health and safety of their existing student body. *See generally* Zearfoss Decl. In any event, attending in-person classes in the midst of a raging pandemic would subject the Plaintiffs and the people around them –including high-risk family members – to risk of infection with COVID-19. Mishori Decl. ¶ 25-34. Thus, as a practical matter, if the July Guidance stands, Plaintiffs will be forced to leave the country, incurring numerous harmful impacts on Plaintiffs.

For one, Plaintiffs cannot practically continue their education if they are forced to leave the country. Several Plaintiffs have limited internet access and limits imposed by the government of their home country on the computer tools that their schools use to communicate and collaborate, preventing them from fully accessing the curriculum. To the extent Plaintiff could access class remotely, the difference in time zones would require them to attend classes in the middle of the night or lose the opportunity to actively participate in class by attending recorded sessions. Plaintiffs also will be severely limited in their opportunities to participate in clinics or pro bono work, which

30

impacts their academic standing. These limitations will disadvantage Plaintiffs with respect to job and training opportunities. *See supra* at Background Part D.

Further, Plaintiffs will face extreme financial losses and hardship if they are forced to return to their home countries at this late stage. Plaintiffs have already signed leases and put down money on housing that would be lost; they would have to incur travel and moving expenses not only to move back to their home countries, but also to return to the U.S. if their schools return to in person classes. Plaintiffs who have purchased U.S. health insurance also would lose both the money they invested and the benefit of that insurance–in the midst of a global pandemic. *See supra* at Background Part D.

Traveling back to their home countries may also be extremely difficult for certain Plaintiffs. Multiple countries have banned all transnational flights in response to the pandemic, and others—including China the home country of several Plaintiffs—require incoming travelers to quarantine at their own expense for two weeks upon arrival. Moreover, the travel itself would expose Plaintiffs to healthy risks, as lengthy transnational flights present multiple infection risks. *See supra* at Background Part D.

Finally, Plaintiffs will suffer severe personal hardships if the July Guidance were allowed to stand, including separation from spouses, partners, family and friends. Plaintiffs have suffered and will continue to suffer stress and anxiety at the prospect of being deported, losing their expected educational and employment opportunities, and the detrimental and even devastating financial burden of being forced out of the country. *See supra* at Background Part D.

## III.   THE BALANCE OF HARDSHIPS AND PUBLIC INTEREST TIP SHARPLY IN FAVOR OF EMERGENCY RELIEF.

The final factors in evaluating a TRO or preliminary injunction involve the balance of hardships and public interest—factors that generally merge when the Government is a party. *See League of Wilderness Defenders v. Connaughton*, 752

F.3d 755, 766 (9th Cir. 2014). Here, the balance of hardships and public interest tip sharply in favor of emergency relief.

Plaintiffs are students whom the United States invited and encouraged to come here to study. They have invested time, money, and energy into their courses of study, and obviously would be attending classes in person, but for exceptional circumstances beyond their control. Defendants' threat to deport them thrown their lives—and the lives of other international students—into complete disarray, impacting their educational pursuits, their financial well-being, and the health and safety of themselves, their families, and their communities.

On the flip side, Defendants have not identified any material interest supporting the policy. Rather, the very point of the policy change is to *impose severe hardship on international students* to leverage schools into reopening. *See* Bowden, *supra* n.4. Even were that a valid government interest, it proves that the balance of hardships tips decisively in Plaintiffs' favor. Moreover, the Government "cannot suffer harm from an injunction that merely ends an unlawful practice," *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013), and the "public interest is served by compliance with the APA." *East Bay Sanctuary Covenant v. Trump*, 950 F.3d 1242, 1280-81 (9th Cir. 2020) (quoting  *California v. Azar,* 911 F.3d 558, 581 (9th Cir. 2018)).

### CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court issue a TRO enjoining Defendants' implementation of the July 6 Guidance. Such TRO should include requiring Defendants to issue a further broadcast message that the July 6

1   policy change and any related compliance obligations have been enjoined, pending

2   resolution on the merits.

3

4   DATED: July 14, 2020              By:  /s/ David R. Carpenter*
                                            Lisa M. Gilford
5                                           David R. Carpenter
                                            Stacy Horth-Neubert
6                                           Sheri Porath Rockwell
                                            SIDLEY AUSTIN LLP
7

8                                     By:  /s/ Mark D. Rosenbaum
                                            Mark D. Rosenbaum
9                                           PUBLIC COUNSEL
10

11                                    By:  /s/ Evan Caminker
                                            Dean Emeritus and Branch Rickey
12                                          Collegiate Professor of Law
                                            UNIVERSITY OF MICHIGAN
13                                          LAW SCHOOL**
14

15                                    By:  /s/ Mark E. Haddad
                                            USC Gould School of Law
16                                          UNIVERSITY OF SOUTHERN
                                            CALIFORNIA**
17

18                                    Attorneys for Plaintiffs
19                                    Z.W., C.Y, X.Y., A.G., M.X., Z.L., W.R.,
                                      and DOES 1 through 50
20

21

22   * Filer attests that all signatories listed, and on whose behalf the filing is submitted, concur in the filing's content and have authorized the filing.

23   ** University affiliation provided for identification purposes only.

24

25

26

27

28